**In re LASON, INC., et al., Debtors.**

**No. 01–11488(MFW).**

United States Bankruptcy Court, D. Delaware.

Oct. 15, 2003.

Alfred Villoch, III, Curtis J. Crowther, Edward J. Kosmowski, Michael R. Nestor, Robert S. Brady, Timothy Edward Lengkeek, Young Conaway Stargatt & Taylor LLP, Bernard George Conaway, Fox Rothschild, Thomas G. Macauley, Zuckerman and Spaeder LLP, Wilmington, DE, Annette Kerlin McBrayer, Epstein Becker & Green, P.C., Atlanta, GA, Wendy S. Tien, U.S.Department of Justice, Washington, DC, for debtor.

John B. Alfs, Cox, Hodgman & Giarmarco, P.C., Troy, MI, for defendant.

John K. Sherwood, Lowenstein Sandler, Roseland, NJ, for Official Committee of Unsecured Creditors.

*OPINION* [1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court is the Motion of Ark 2000–1 CLO, Limited and Patriarch Partners, LLC (collectively "Ark") for an Order Directing Lason, Inc., et al. ("the Debtors") to release to Ark certain proceeds of the sale of certain assets of the Debtors. For the reasons stated below, the Court will deny Ark's motion.

## I. BACKGROUND

Ark is one of the Debtors' senior lending group ("the Senior Lenders"). Pre-petition, the Debtors had granted to the Senior Lenders liens, mortgages, and security interests in substantially all of the Debtors' assets, including but not limited to, accounts receivable, inventory, machinery, and equipment, and the proceeds and products thereof ("the Collateral").

The original credit agreement ("the Agreement") between the Debtors and the Senior Lenders provided that, if the Debtors sold any of the Collateral, the Senior Lenders would receive 100% of the proceeds. Pursuant to the Third and Fourth Amendments to the Agreement, the Senior Lenders agreed to share proceeds of sales of the Collateral with the Debtors. The right to share in the proceeds, however, expired automatically upon the occurrence of a default. In the summer and fall of 2001, the Debtors stopped making required interest payments and missed a $1 million installment payment due to the Senior Lenders.

In November 2001, the Debtors and certain of the Senior Lenders entered into a Lock–Up Agreement that contemplated an immediate bankruptcy filing by the Debt-

**1.** This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is applicable to contested matters pursuant to Rule 9014.

ors, the sale of various assets and business units, and a pre-arranged plan of reorganization. The Lock–Up Agreement also provided for a sharing of the proceeds of future sales of assets as follows: 75% to the Senior Lenders and 25% to the Debtors. Ark did not consent to the Lock–Up Agreement.

On December 5, 2001 ("the Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. As of the Petition Date, the Debtors were indebted to the Senior Lenders in the approximate principal amount of $260 million. Ark holds 11.958% of the senior debt or approximately $30 million.

On December 7, 2001, the Debtors filed a Motion for authority to sell one of their business units, to distribute 75% of the proceeds of the sale of that business unit to the Senior Lenders, and to retain the balance. Ark filed a limited objection to the sale motion arguing that it was entitled to its full portion of the sale proceeds (approximately $1.66 million), since it never consented to the Lock–Up Agreement. Pursuant to a Stipulated Order dated April 25, 2002, the parties agreed to escrow Ark's portion of the sale proceeds pending the resolution of the dispute.

The Debtors' Plan of Reorganization was subsequently confirmed on May 17, 2002, with an effective date of July 1, 2002. The Plan provided for Ark and the other Secured Lenders to receive the full value of their Collateral (approximately $90 million) in the form of cash and notes, plus a share of the equity in the reorganized company. The Secured Lenders voted unanimously in favor of the Reorganization Plan, except for Ark which abstained from voting.

On July 1, 2002, Ark filed a Motion seeking the release of the escrowed funds, which was opposed by the Debtors. Evidentiary hearings were held on February 5, February 6, and March 18, 2003. The parties have filed post-hearing briefs.

## II.  JURISDICTION

This Court has jurisdiction over this matter, which is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2)(A), (L), (M), (N), and (O).

## III.  DISCUSSION

### A.  Parties' Agreements

■ Ark argues that it is entitled to receive its full share of the proceeds of the sale of the Debtors' assets under the Agreement. Ark argues that the amendments to the Agreement, whereby it agreed to share sale proceeds, had expired pre-petition because of the Debtors' various defaults. As a result, the Agreement required that all of the sale proceeds go to the Senior Lenders. Ark asserts that any modifications to the Agreement or waiver of defaults required the approval of all the Senior Lenders. (Agreement, § 12.5(1a).) Since Ark never consented to the Lock–Up Agreement, Ark did not waive the defaults or amend the Agreement.

The Debtors argue that Ark is bound by the Lock–Up Agreement. They contend that section 12.5 of the Agreement allows holders of a majority of the indebtedness to amend or modify the Agreement and to waive defaults; approval of all of the Senior Lenders is required only for certain actions such as the reduction or forgiveness of principal, fees, or interest or the extension of the Maturity Date, Termination Date or fixed payment dates. (Agreement, § 12.5(a)(i).) [2]  Since the Plan

---

**2.**  Section 12.5(i) of the Agreement states that the approval of all Lenders is required to

"reduce or forgive the principal amount of any Loan, reduce or forgive any fees or other

provides the Senior Lenders with the total amount of their secured claim as of the Petition Date (the $90 million value of their collateral), the Debtors assert that neither the Lock–Up Agreement nor the Plan forgave or reduced any portion of the pre-petition debt.[3]

We disagree with the Debtors' contention. The Lock–Up Agreement contemplated a Plan which would forgive and reduce portions of the debt and extend the maturity date under the Agreement. In addition, the Lock–Up Agreement changed certain fixed payment dates under the Agreement. Section 12.5 of the Agreement required all Senior Lenders' consent to amendments that directly and significantly affect a Senior Lender. Forgiving defaults, reducing debt and changing fixed dates constitute amendments to the Agreement, which require Ark's consent. Ark did not provide such consent, and thus Ark is not bound by the Lock–Up Agreement.

## B.  *Section 1129(a)(7)(A)*

The Debtors argue, alternatively, that Ark is bound by the terms of the Plan of Reorganization. Ark argues that the "best interest test" of section 1129(a)(7)(A) of the Bankruptcy Code was not met. Specifically, Ark argues that the Plan does not provide Ark with the full value of its secured claim because 25% of the proceeds of the Collateral securing Ark's claim is taken from Ark and given to the Debtors.

### 1.  *Res Judicata*

■ The Debtors argue preliminarily that Ark's objection is barred by the Confirmation Order. Since the value of the Collateral was set at $90 million when the Plan was confirmed, the Debtors argue that the confirmation order is res judicata with respect to the valuation issue. Ark responds that all its rights were preserved in the Stipulation Order which provides:

> each of Lason and Ark reserves all claims, rights remedies, causes of action and defenses under the Credit Facility loan documents and related agreements by and between (a) Lason and (b) the Credit Facility Lenders, and otherwise with respect to [the sale proceeds].

Stipulation Order at ¶ 2.

Moreover, the Disclosure Statement also provided that "in connection with the confirmation of the [Plan] and any object [sic] thereto, none of the aspects of the Debtors' Liquidation Analysis ... shall be binding upon any party-in-interest or be deemed a waiver or admission of any type or nature whatsoever." Consequently, we conclude that Ark's claims to the sales proceeds and Ark's rights to raise issues relating to the Plan's compliance with section 1129 were adequately preserved until a decision on its Motion.

### 2.  *Section 1144*

■ The Debtors also argue that what Ark is seeking is a revocation of the Confirmation Order which is now barred because more than 180 days have passed

---

Obligations (other than fees payable to the Agent for its own account), or (ii) extend the Maturity Date, the Termination Date or any other date fixed for the payment of any principal of or any interest on any Loan (other than additional interest payable under Section 2.8(b) at the election of the Required Lenders, as provided therein), any fees (other than fees payable to the Agent for its own account) or any other Obligations or extend the expiry date of any Facility Letter of Credit beyond the day prior to the Termination Date."

**3.**  The Debtors also argue that Ark consented to the Lock–Up Agreement and its modification of the Agreement via Ark's silence. We reject this contention. There is no evidence to support the Debtors' arguments that they relied upon Ark's silence as a waiver of Ark's rights. At every opportunity, Ark consistently asserted that it was not bound by the Lock–Up Agreement.

since entry of the Order. "Section 1144 provides that a party requesting revocation of an order confirming a chapter 11 plan must file its request within 180 days of entry of that order.... This deadline is strictly enforced." *In re Vencor, Inc.,* 284 B.R. 79, 83 (Bankr.D.Del.2002). The section 1144 limitation period expired on November 13, 2002. However, Ark claims that its rights were preserved by the Stipulation Order and the Confirmation Order need not be revoked to give it the relief it seeks.

We agree with Ark. The Stipulation preserved all of Ark's rights to argue it had rights to the escrowed funds, regardless of its treatment under the Plan.[4]

### 3. *Best Interests of Creditors*

Ark asserts that the Debtors' Plan did not comply with section 1129(a)(7) because in a chapter 7 case the Collateral would realize value in excess of the $90 million that the Senior Lenders receive under the Plan. Consequently, Ark argues that what it is receiving under the Plan is less than what it would have received if the Debtors were liquidated under chapter 7 on the effective date of the Plan.

Section 1129(a)(7)(A) provides that a plan may only be confirmed if each holder of an impaired claim either accepts the plan or:

> will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

11 U.S.C. § 1129(a)(7)(A)(ii).

■ To measure value, the Court must contrive a hypothetical chapter 7 liquidation conducted on the effective date of the plan. *In re Sierra–Cal,* 210 B.R. 168, 171–172 (Bankr.E.D.Cal.1997). Section 1129(a)(7)(A) requires a determination whether "a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization." *Id.* The proponent of the plan bears the burden of showing that the best interest of creditors has been satisfied. *In re Genesis Health Ventures, Inc.,* 266 B.R. 591 (Bankr.D.Del.2001) (citations omitted).

■ The parties disagree on the appropriate valuation standard under section 1129(a)(7). Ark asserts that the assets could be sold as a going concern, pursuant to sections 704(1), 721, and 363, because the Debtors were not incurring operating or cash flow losses and had cash on hand on the effective date of the Plan. The Debtors argue that a hypothetical sale of the company under chapter 7 would have realized significantly less than a sale as a going concern. They assert that the appointment of a chapter 7 trustee would have destroyed the value of the Debtors as a going concern and devastated the Debtors' customer base, because the Debtors are a service business.

To support its position that the use of going concern value is appropriate, Ark relies on the *Genesis Health Ventures* and *Quarter Moon* cases. In *Quarter Moon,* the Court allowed the chapter 7 trustee to operate a cattle ranch and delayed liquidation for several months until the livestock were more marketable. *In re Quarter Moon,* 116 B.R. 775 (Bankr.D.Idaho 1990). However, unlike the cattle ranch in *Quarter Moon,* the Debtors' business in

---

4. We further note that Ark's Motion was filed on July 1, 2003, before the expiration of the 180 days provided in section 1144.

this case involves no hard assets available for sale. Rather the Debtors' business is a service business, largely dependent on customers and key employees.

In *Genesis Health*, the Court concluded that the "best interest of creditors" test was met based on expert testimony that the sale of the assisted living facilities as lines of business in an operational mode would maximize recovery. *Genesis Health*, 266 B.R. at 610–11. But that sale was accomplished in chapter 11, not by a chapter 7 trustee. In fact, since the Court found that the Debtors' Plan met the "best interest of creditors" test, it concluded that creditors were getting more by the Debtors' sale than if the chapter 7 trustee had sold the businesses (even as a going concern). This supports the Debtors' argument that liquidation under chapter 7 typically realizes less than the value of the Debtors' assets in chapter 11. In addition, the debtors in *Genesis Health* had physical assets to sell in contrast to the Debtors here, which have only a service business without any long term contracts.

We recognize that "[t]he hypothetical liquidation entails a considerable degree of speculation about a situation that will not occur unless the case is actually converted to a chapter 7." *Sierra–Cal*, 210 B.R. at 171–172. A liquidation "contemplates valuation according to the depressed prices that one typically receives in distress sales." *Id.* (citations omitted).

However, we agree with Ark that a chapter 7 liquidation may be done either under "forced sale" conditions or as a going concern. While section 704(1) states that the trustee is to reduce the debtor's assets to money "as expeditiously as is compatible with the best interests of parties in interest," section 721 authorizes the chapter 7 trustee "to operate the business of the debtor for a limited period, if such operation is in the best interest of the estate and consistent with the orderly liquidation of the estate." 11 U.S.C. §§ 704(1) & 721. *See, e.g., In re A & T Trailer Park, Inc.*, 53 B.R. 144, 147 (Bankr.D.Wyo.1985) (authorization to operate contemplated in a limited number of situations, such as where it appears the business could be sold for a greater price as a going concern than in a liquidation).

■ Nonetheless, the evidence presented at the hearing established that a conversion to chapter 7 would have had a deleterious effect on the value of the Debtors' business. The Debtors' President and Chief Executive Officer testified that if the case had been converted to chapter 7 or if the Debtors had failed to emerge from chapter 11 by Spring 2002, the customers "would have headed for the hills." In fact, the Debtors did lose numerous customers after several key executives left the company. He testified that many customers remained with the Debtors only after the Debtors provided assurances that its prearranged Plan would keep the company from liquidation. Even with those assurances, customers developed contingency plans to ensure the continuation of "mission critical" services in case the Debtors failed to reorganize quickly.

The financial advisor to the Secured Lenders supported the Debtors' testimony. He testified that any value obtained through liquidation would have been significantly lower than under the Plan. He opined that the only hope for any payment to the Secured Lenders was to avoid a liquidation and keep the company afloat because the Debtors have no hard assets. He testified that a conversion to chapter 7 would have been "cataclysmic" and "the values would have plummeted."

Ark's expert testified that selling the Debtors' business other than as a going concern was not in the best interest of

creditors. However, he could not testify from any personal experience as to how the Debtors could have been sold as a going concern in chapter 7. He had no relevant chapter 7 liquidation experience to render a reliable opinion and had "never seen robust bidding in a chapter 7."

As a result, we conclude that, while a liquidation analysis may include the sale of a company as a going concern by a chapter 7 trustee under sections 704(1) and 721, the sale of these Debtors' businesses as a going concern, because they are so firmly based on key employees and customers' good will, could not have been accomplished under chapter 7.

With that general framework, we conclude that the valuation evidence presented at the hearings demonstrates that the requirements of section 1129(a)(7)(A) have been met. The Debtors' expert testified that the value of the company was $20–28 million at the time the Debtors emerged from bankruptcy.[5] The Debtors had previously realized approximately $55 million in asset sales before confirmation. Thus, for purposes of section 1129(a)(7), the Debtors' expert opined that the liquidation value of the Collateral was $75–$83 million, less than the $90 million in value that the Secured Lenders received under the terms of the Plan.

In contrast, Ark's expert testified that the value of the Debtors' businesses was between $79 million and $111 million[6] based on the restructured company being operated and sold as a going concern at fair market value. However, Ark's expert lacked relevant experience, which limited the weight of his testimony. He had never valued a company in bankruptcy and had never been involved in a chapter 7 liquidation. In contrast, the Debtors' expert was an investment banker with significant experience in "distressed sales."

Additional evidence, including documents prepared by Ark, demonstrate that the "best interest of creditors" test was satisfied. In June 2002, Ark offered to buy claims from other Secured Lenders for 35 cents on the dollar, suggesting the Debtors' value was approximately $75.6 million.[7] In addition, during the case Ark's financial advisor had prepared numerous spreadsheets which suggested that the Debtors had a net present value of $21 to $28 million under various EBITDA multiples and discount rates.

Based on the overwhelming evidence presented at the hearing, we conclude that the value of the Debtors if sold under chapter 7, even as a going concern, is less than the $90 million in value being paid to the Senior Lenders under the Plan. Thus,

---

5. This projection was significantly less that his original estimate of $30.5 to $54.7 million. The original projection was presented in connection with the confirmation of the Debtors' Plan and assumed that the company was successfully reorganized under chapter 11, maintained its customer relationships and retained important employees and senior executive managers. The Debtors' expert subsequently revised the projections to reflect additional risks. Ark argued that the doctrine of judicial estoppel precluded the Debtors from offering valuation evidence that differed from the evidence offered at the confirmation hearing. We overruled that objection, however, be-

cause the Debtors' revised valuation report merely reflects events that had occurred since the original report and assumptions that were not made in the earlier report.

6. For Ark to recover the full $1.66 million from the Sale Proceeds, the value of the Collateral as of the effective date of the Plan must be approximately $104 million.

7. At that time, the secured debt was approximately $205 million ($260 million was due as of the petition date less $55 million realized from the asset sales).

we conclude that the requirements of section 1129(a)(7) have been met.

### C. *Section 506*

Ark also contends that it is entitled to the sale proceeds under section 506(a). Ark cites to *Associates Commercial Corp. v. Rash,* 520 U.S. 953, 957, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997) for the proposition that the fair market value of the debtor is the applicable standard where a debtor retains collateral.

The Debtors assert that section 506 is relevant only in determining the amount of a pre-petition lender's secured claim, not to the valuation of the Debtors' business. They argue that the valuation of the Debtors' businesses confirms that Ark and the other secured creditors are receiving 100% of their secured claims under the Plan. If Ark were permitted to recover the sale proceeds as well, then Ark would receive cash and notes totaling more than $12,360,000, or roughly 115% of its allowed secured claim. The Debtors assert that this is not mandated by section 506(a).

We agree with the Debtors. Section 506(a) states "an allowed claim of a creditor ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property." 11 U.S.C. § 506(a). We have found that the value of the Debtors as of the Petition Date was $90 million. As the holder of 11.96% of the secured debt under the Agreement, Ark's pro rata share of the Collateral is $10,764,000. It is receiving full value for that secured claim under the terms of the Plan. A secured creditor is not entitled to receive more than 100% of its secured claim. *Genesis Health,* 266 B.R. at 612. Thus, we conclude that section 506(a) does not mandate that Ark receive the proceeds of the sale of the Collateral which occurred post-petition but pre-confirmation.

### IV. *CONCLUSION*

For the foregoing reasons, Ark's Motion for an Order Directing the Payment of Funds will be denied.