**In re ADELPHIA COMMUNICATIONS CORPORATION, et al., Debtors,**

**ACC Bondholder Group, Appellants,**

v.

**Adelphia Communications Corporation, et al., Appellees.**

Nos. 02–41729, M47 (SAS).

United States District Court,
S.D. New York.

Jan. 24, 2007.

Weil, Gotshal & Manges LLP, By: Martin J. Bienenstock, Brian S. Rosen, Richard W. Slack, Vernon S. Broderick, New York, NY, Melanie Gray, Sylvia Mayer, Houston, Texas, for ACC Bondholder Group.

Stutman, Treister & Glatt P.C., By: Isaac M. Pachulski, Stephan M. Ray, Los Angeles, CA, Co–Counsel for ACC Bondholder Group.

Willkie Farr & Gallagher LLP, By: Marc Abrams, Myron Trepper, Roger D. Netzer, Paul V. Shalhoub, Brian E. O'Con-nor, Terence K. McLaughlin, Rachel Strickland, New York, NY, for Debtors and Debtors in Possession.

Kasowitz, Benson, Torres & Friedman LLP, By: David M. Friedman, Adam L. Shiff, Howard W. Schub, New York, NY, for Official Committee of Unsecured Creditors.

Klee, Tuchin, Bogdanoff & Stern LLP, By: Edward T. Attanasio, Los Angeles, CA, for Official Committee of Unsecured Creditors.

Morgenstern Jacobs & Blue LLC, By: Gregory A. Blue, Eric B. Fisher, New York, NY, for Official Committee of Equity Security Holders.

Sheppard Mullin Richter & Hampton LLP, By: David J. McCarty, Los Angeles, CA, for U.S. Bank National Association, as Indenture Trustee in Respect of Arahova Notes.

Seward & Kissel LLP, By: Arlene R. Alves, New York, NY, for Law Debenture Trust Company of New York, as ACC Senior Notes Trustee.

White & Case LLP, By: J. Christopher Shore, New York, NY, for Ad Hoc Committee of Arahova Noteholders.

Fried Frank Harris Shriver & Jacobson LLP, By: Gary Kaplan, New York, NY, for W.R. Huff Asset Management Co., L.L.C.

Haynes and Boone, LLP, By: Robin E. Phelan, Judith Elkin, New York, NY, for Bank of America, N.A., as Administrative Agent for the Century Cable Lenders.

Bracewell & Giuliani, LLP, By: Jennifer Feldcher, New York, NY, for Ad Hoc Committee of Non–Agent TCI and Parnassos Lenders.

Simpson Thacher & Bartlett LLP, By: Peter Pantaleo, Elisha D. Graff, New York, NY, for Wachovia Bank, N.A., as

Administrative Agent for the UCA Lenders.

Goodwin Procter LLP, By: Michael K. Isenman, Washington, D.C., By: Gina Lynn Martin, Boston, MA, By: Allan S. Brilliant, New York, NY, for Highfields Capital Management and Tudor Investment Corporation.

Pachulski Stang Ziehl Young Jones & Weintraub P.C. LLP, By: Dean Ziehl, New York, NY, By: Richard Pachulski, Los Angeles, CA, for Ad Hoc Bondholders' Committee (a/k/a Committee II).

Clifford Chance U.S. LLP, By: Andrew Brozman, James Moyle, New York, NY, for Calyon New York Branch.

Clifford Chance U.S. LLP, By: Angelique Shingler, New York, NY, for Bank of N.Y.

Cadwalader Wickersham & Taft LLP, By: Kathryn L. Turner, New York, NY, for Perry Capital, LLC.

Sidley Austin LLP, By: Lee S. Attanasio, New York, NY, for Fort Myers Noteholders.

Cole, Schotz, Meisel, Forman & Leonard, P.A., By: John H. Drucker, New York, NY, for Class Action Plaintiffs.

Kramer Levin Naftalis & Frankel LLP, By: Kenneth H. Eckstein, Jeffrey S. Trachtman, New York, NY, for FrontierVision Ad Hoc Committee.

Milbank, Tweed, Hadley & McCloy LLP, By: James C. Tecce, New York, NY, for JPMorgan Chase Bank.

Kirkland & Ellis LLP, By: Richard L. Wynne, Michael I. Gottfried, Los Angeles, CA, for Ad Hoc Committee of Lenders.

Cleary, Gottlieb, Steen & Hamilton, By: Lindsee P. Granfield, Luke A. Barefoot,

Jane Kim, New York, NY, for Certain Investment Banks.

Satterlee, Stephens, Burke & Burke, LLP, By: Christopher R. Belmonte, New York, NY, for Prestige Communications.

Shearman & Sterling, LLP, By: Marc B. Hankin, New York, NY, for Rembrandt Technologies, L.P.

Kleinberg, Kaplan, Wolff & Cohen, PC, By: David Parker, New York, NY, for Elliot Associates, LP and John Pike.

Kelley, Drye & Warren, LLP, By: Geoffrey W. Castello, Parsippany, NJ, for Wilmington Trust Co.

Dorsey & Whitney, LLP, By: Katherine A. Constantine, Minneapolis, MN, for U.S. Bank, N.A., as Indenture Trustee.

Wilmer, Cutler, Pickering, Hale & Dorr, LLP, By: Joel Millar, New York, NY, for Credit Suisse and Royal Bank of Scotland.

Luskin, Tern & Eisler, LLP, By: Michael Luskin, New York, NY, for The Bank of Nova Scotia.

Farrell Fritz, P.C., By: Louis A. Scarcella, Uniondale, NY, for Associated Electric & Gas.

Brown Rudnick Berlack Israels, LLP, By: Steven D. Pohl, New York, NY, for Ad Hoc Trade Claims Committee.

Baker Botts, LLP, By: Eric Soderlund, Dallas, TX, for Verizon Media Ventures.

*OPINION AND ORDER*

SCHEINDLIN, District Judge.

The present dispute arises out of the approximately 230 jointly administered chapter 11 cases of Adelphia Communications Corporation ("ACC") and its subsidiaries (collectively, the "Debtors"). The ACC Bondholder Group[1] now moves, pur-

1. The ACC Bondholder Group is comprised of holders and/or investment advisors to certain holders of over one billion dollars of notes and debentures issued by the parent compa-

suant to Federal Rule of Bankruptcy Procedure 8005, for a stay pending appeal and for an expedited appeal with respect to the Bankruptcy Court's confirmation order (the "Confirmation Order") approving the First Modified Fifth Amended Joint Chapter 11 Plan (the "Plan").[2]

The application for a stay of an order confirming a chapter 11 reorganization plan in a highly litigated and complex bankruptcy proceeding presents a classic clash of competing interests, all of which have merit. Without a stay, it is extremely unlikely that Appellants will ever be able to have meaningful appellate review of the rulings of the Bankruptcy Court, a non-Article III court, and in any event, a lower court. The ability to review decisions of the lower courts is the guarantee of accountability in our judicial system.[3] In other words, no single judge or court can violate the Constitution and laws of the United States, or the rules that govern court proceedings, with impunity, because nearly all decisions are subject to appellate review. At the end of the appellate process, all parties and the public accept the decision of the courts because we, as a nation, are governed by the rule of law. Thus, the ability to appeal a lower court ruling is a substantial and important right.

On the other hand, a stay of a confirmation order in one of the longest-running and most complex bankruptcies in our history threatens grave harm to thousands of parties who have been waiting for more than four years to obtain sizeable distributions from a group of bankrupt estates. After grueling negotiations, a plan of reorganization and a settlement of many ancillary disputes has been reached. The Plan was put to the vote of creditors and overwhelmingly approved. The Plan was subject to searching review by the Bankruptcy Court, which approved it in a lengthy decision. The inability to consummate the Plan resulting from a stay of that order could cause the estates to incur more than a billion dollars in additional costs or could even cause the Plan to collapse. This is not a risk that should be taken lightly.

In sum, as set forth above, two weighty interests are at stake. The right to review of lower court decisions clashes with the right of the majority of creditors to receive their distributions. Weighing these competing interests is one of the most difficult tasks this Court has yet confronted. This is so because the stay application, so to speak, is the ball game.[4] Without permitting Appellants an opportunity for full

---

ny, ACC, in the aggregate principal amount of $4.9 billion (or $5.1 billion including prepetition accrued interest), namely: Aurelius Capital Management, LP, Banc of America Securities LLC, Catalyst Investment Management Co., LLC, Drawbridge Global Macro Advisors LLC, Drawbridge Special Opportunities Advisors LLC, Elliott Associates, LP, Farallon Capital Management L.L.C., Lehman Brothers, Inc. (Global Principal Strategies Business), Noonday Asset Management L.P., Perry Capital LLC, and Viking Global Investors LP (collectively, the "ACC Bondholder Group" or "Appellants").

2. The Official Committee of Equity Security Holders (the "Equity Committee") has also moved for a stay of the Confirmation Order

pending appeal. This Opinion does not address that motion as the parties have resolved that application. *See* Order dated January 23, 2007(SAS).

3. *See, e.g.,* Justice Sandra Day O'Connor, *"The Threat to Judicial Independence,"* The Wall Street Journal, Sept. 27, 2006, at A18 ("Judges can—and do—sometimes render erroneous decisions, but that is why appeals are allowed to higher courts.").

4. All parties have had a full opportunity to be heard on the stay application. Hundreds of pages of briefs and thousands of exhibits were submitted and the Court heard argument for more than five hours over the course of two days.

briefing and a hearing on the merits of the appeal, this Court's decision on the stay may well eliminate Appellants' right to challenge the lower court's ruling. Nonetheless, many courts have confronted this dilemma and guidelines have been developed to assist the Court in its task. After a careful review in the limited time available of all of the submissions and arguments, I am granting a stay pending appeal only upon a condition requiring the posting of a very substantial bond.

## I. BACKGROUND [5]

These chapter 11 cases, which were are "among the most challenging—and contentious—in bankruptcy history," [6] have been litigated for more than four and a half years in the Bankruptcy Court. Various disputes arose among the creditors as to how the ultimate value of the estate would be allocated, including how to resolve the Intercompany Claims (claims between and among the various debtors), fraudulent transfer actions, and other inter-debtor causes of action (collectively, the "Inter–Creditor Dispute").

In August 2005, the Bankruptcy Court established a process to resolve the Inter–Creditor Dispute by which the Debtors and the Official Committee of Unsecured Creditors (the "Creditors Committee") were ordered to remain neutral and several unofficial committees of creditors were deputized to litigate the Inter–Creditor Dispute (the "MIA [Motion in Aid of Confirmation] Litigation") on behalf of the debtors (the "MIA Order").[7] The twenty-three member Ad Hoc Committee of ACC Senior Noteholders (the "ACC Noteholders Committee") was one such committee; it was deputized as an authorized litigant on behalf of ACC.[8] The MIA Order explicitly reserved the Debtors' right to "seek[ ] to compromise" one or more issues in the Inter–Creditor Dispute, but the authorized litigants had the right to object to any such compromise as well as to assert that the Debtors had no authority to compromise those issues.[9]

Previously, in April 2005, ACC had entered into definitive sale agreements with Time Warner and Comcast (the "Buyers") to purchase substantially all of the Debtors' U.S. assets with cash and Time Warner Cable, Inc. ("TWC") stock (the "Sale"). Under the agreements, the Sale was to be implemented as part of a plan of reorganization and that plan had to become effective by a date certain. In November 2005,

---

5. This section sets forth a general overview of the background of the present dispute. A more detailed summary of the record can be found in the Bankruptcy Court Bench Decision on Confirmation, dated January 3, 2007 ("Bench Dec.").

6. Bench Dec. at 1.

7. *See* Ex. 15 (Order in Aid of Confirmation, Pursuant to Sections 105(a) and 105(d) of the Bankruptcy Code Establishing Pre–Confirmation Process to Resolve Certain Inter–Creditor Issues, dated August 4, 2005 ("MIA Order")). Citations in the form "Ex. __" refer to exhibits attached to the Affidavit of Martin J. Bienenstock in Support of Order to Show Cause for Stay Pending Appeal and Expedited Appeal.

8. All of the members of the ACC Bondholder Group were members of the ACC Noteholders Committee. *See* Bench Dec. at 15 n. 16.

9. *See* MIA Order ¶ 12(a), which provides:

Nothing contained herein shall preclude the Debtors from seeking to compromise one or more of the Dispute Issues (either by separate motion or in connection with a proposed plan of reorganization) on notice to the appropriate parties, and nothing herein shall prejudice the rights of any Participant [defined in paragraph 3 as any of the authorized litigants] to object to any such compromise and/or to assert that the Debtors have no authority to compromise such disputes.

a plan was proposed that provided for the implementation of the Sale. However, multiple creditors pressed multiple objections, and the plan could not garner the requisite support among the creditor classes when it was put to a vote. With the deadline to consummate the Sale fast approaching, the Time Warner/Comcast deal was in jeopardy.

The parties spent months trying to settle the Inter–Creditor Dispute in order to facilitate an agreement on a plan to no avail. As a result, the Debtors and the Buyers agreed to a sale under section 363 of the Bankruptcy Code in lieu of a plan. As part of the renegotiation, however, the Debtors and the Buyers agreed in Purchase Agreements that the Debtors had to confirm a plan of reorganization within three months of the relevant Time Warner registration statement being declared effective by the SEC (the "IPO Deadline") or else the Debtors would be required to sell at least one-third of TWC stock in an underwritten public offering (the "IPO Condition").[10] A registrations statement has since been submitted to the SEC for comment, but has not yet been approved.

Even though the Time Warner/Comcast deal was no longer dependent on the resolution of the Inter–Creditor Dispute, the parties continued settlement negotiations. On April 6, 2006, the Bankruptcy Court entered an order authorizing the Debtors to file a plan of reorganization that included a proposed settlement of the Inter–Creditor Dispute.[11] The authorization was conditioned upon the plan being structured to permit creditors to accept or reject: (a) the plan with the settlement, or (b) the plan without the settlement.[12] In other words, continuation of the MIA Litigation had to be an option.

After months of negotiations, an early iteration of the current settlement of the Inter–Creditor Dispute (the "Settlement") was reached and the original term sheet was signed on or about June 21, 2006 by several of the ad hoc committees. However, at that time the term sheet was not signed by the Debtors, the Creditors Committee and several other ad hoc committees, including the ACC Noteholders Committee, which had unanimously rejected that term sheet.[13] Negotiations recommenced and on July 7, 2006, a second iteration of the Settlement was signed by Tudor and Highfields, two members of the ACC Noteholders Committee (in their individual capacity as creditors) as well as the Creditors Committee.[14] That second iteration was voted upon by the ACC Noteholders Committee, but was again rejected.[15] On July 21, 2006, the Debtors entered into the Settlement with all of the committees (except the ACC Noteholders Committee) plus the two individual mem-

---

**10.** The deal ultimately closed on July 31, 2006, and ACC received $12.7 billion in cash and 155,913,430 shares of TWC stock, which as of the date of confirmation, was valued at $6.5 billion. Of the cash, $2.7 billion has already been distributed pursuant to a separate plan that is not at issue here.

**11.** *See* Ex. 41 (April 6, 2006 Order Authorizing Debtors to File Plan of Reorganization that Provides for, Among Other Things, Proposed Settlement of Inter–Creditor Disputes ("April 6 Order")).

**12.** *See id.* ¶ 3.

**13.** *See* Ex. 16 (Affidavit of John Pike in Support of the ACC Bondholder Group's Objection to Approval of the Global Settlement and Confirmation of the Plan ("Pike Aff.")) ¶ 30.

**14.** *See* Bench Dec. at 46.

**15.** The split of the vote is not in the record, but Appellants represent that the split was twenty-one to two against the Settlement. *See* 1/15/07 Appellants' Reply Letter Brief to the Court ("Appellants' Rep. Mem."), at 11.

bers of the ACC Noteholders Committee.[16] However, eventually three more members of that Committee negotiated a slight improvement and signed the Settlement in their individual creditor capacity.[17]

On August 18, 2006, the Debtors, the Creditors Committee, and bank lender agents Wachovia, Bank of Montreal, and Bank of America (collectively, the "Plan Proponents" or "Appellees") filed the first iteration of the present Plan with the Bankruptcy Court. On October 17, 2006, the court approved the disclosure statement for the final Plan, and the solicitation process began. More than the two-thirds of the members of all classes of creditors, including the ACC impaired classes, voted to approve the Plan.[18]

In December 2006, the Plan Proponents jointly proposed the present Plan to the Bankruptcy Court for confirmation. If the Plan goes effective, it provides for the distribution of cash and TWC stock to creditors. The Plan also provides for the transfer of the Bank Litigation [19] to the Contingent Value Vehicle (the "CVV"), a litigation trust, tradeable interests in which will be distributed among creditors (the "CVV Interests"). In addition, the Plan includes the Settlement of the Inter–Creditor Dispute.

The Plan confirmation hearings commenced on December 7, 2006 and concluded on December 19, 2006. Various parties in interest raised objections, including the ACC Bondholder Group. On January 3, 2007, the Bankruptcy Court entered its order confirming the Plan. The Bankruptcy Court stayed its order for ten days pursuant to Federal Rule of Bankruptcy Procedure 3020(e), but declined to further extend the stay, directing any subsequent requests to be submitted to the District Court.[20]

## II. LEGAL STANDARD

### A. Appeals of Bankruptcy Court Orders

#### 1. Final Order

The district courts are vested with appellate jurisdiction over bankruptcy court rulings.[21] Final orders of the bankruptcy court may be appealed to the district court as of right.[22] An order is final if "[n]othing in the order ... indicates any anticipation that the decision will be reconsidered." [23] Courts have held that orders confirming a plan of reorganization or denying relief from an automatic stay are final.[24]

---

**16.** *See* Bench Dec. at 46–47.

**17.** *See* Brief in Support of Emergency Motion of Appellants['] for Stay Pending Appeal and Expedited Appeal ("Appellants' Mem."), at 4.

**18.** *See* Bench Dec. at 1.

**19.** The "Bank Litigation" consists of claims brought on behalf of Debtors against the Debtors' pre-petition lenders and investment banks in connection with their role in the ACC fraud perpetrated by the Rigas family.

**20.** In exercising his discretion to allow the ten day automatic stay provided for by Rule 3020(e) to take effect, the Bankruptcy Court wrote that "fairness to the ACC Bondholder Group ... requires that I not take an affirma-

tive step that would foreclose all opportunities for judicial review...." Bench Dec. at 251. *See* Fed. R. Bankr.P. 3020(e) ("An order confirming a plan is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise.").

**21.** *See* 28 U.S.C. § 158(a).

**22.** *See id.* § 158(a)(1).

**23.** *In re Palm Coast, Matanza Shores Ltd. P'ship,* 101 F.3d 253, 256 (2d Cir.1996).

**24.** *See In re Worldcom, Inc.,* No. M–47, 2003 WL 21498904, at *5 (S.D.N.Y. June 30, 2003). In any event, the parties do not dispute that the Bankruptcy Court's Confirmation Order and denial of a further stay is final.

## 2. Standard of Review

▮▮▮ A district court functions as an appellate court in reviewing judgments rendered by bankruptcy courts.[25] Findings of fact are reviewed for clear error.[26] A finding of fact is clearly erroneous if the court is " 'left with the definite and firm conviction that a mistake has been committed.' "[27] A bankruptcy court's conclusions of law, by contrast, are reviewed de novo.[28]

## B. Stay Pending Appeal

Rule 8005 of the Federal Rules of Bankruptcy Procedure governs the procedure for seeking a stay pending an appeal to the district court of a bankruptcy court's order. "The Rule does not articulate, however, the standard that governs such motions."[29] Courts within the Second Circuit have followed the same standard used for stays of district court orders pending appeals to the circuit court under Federal Rule of Appellate Procedure 8(a)(1)(A) ("Rule 8A"), in large part because Bankruptcy Rule 8005 is directly adapted from Rule 8A.[30]

▮▮▮ The decision as to whether to issue a stay of an order pending appeal lies within the sound discretion of the district court.[31] "[F]our factors are considered" in exercising that discretion: "(1) whether the movant will suffer irreparable injury absent a stay, (2) whether a party will suffer substantial injury if a stay is issued, (3) whether the movant has demonstrated a substantial possibility, although less than a likelihood, of success on appeal, and (4) the public interests that may be affected."[32]

A number of lower courts within the Second Circuit have concluded that the failure of the movant to satisfy any one of

**25.** *See In re Sanshoe Worldwide Corp.,* 993 F.2d 300, 305 (2d Cir.1993) ("[Appellant] relies on several cases for the reasonable proposition that the district court acts as an appellate court in reviewing a bankruptcy court's judgments.").

**26.** *See* Fed. R. Bankr.P. 8013 ("Findings of fact ... shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."). *Accord In re Cody, Inc.,* 338 F.3d 89, 94 (2d Cir.2003).

**27.** *In re Manville Forest Prods. Corp.,* 896 F.2d 1384, 1388 (2d Cir.1990) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).

**28.** *See In re Cody,* 338 F.3d at 94; *In re 139–141 Owners Corp.,* 313 B.R. 364, 367 (S.D.N.Y.2004) (same).

**29.** *In re Savage & Assocs., P.C.,* No. 05 Civ. 2072, 2005 WL 488643, at *1 (S.D.N.Y. Feb. 28, 2005).

**30.** *See In re Turner,* 207 B.R. 373, 375–76 (2nd Cir. BAP 1997) (citing Fed. R. Bankr.P. 8005 Advisory Committee Note (1983) and *In re Country Squire Assocs. of Carle Place, L.P.,* 203 B.R. 182, 183 (2nd Cir. BAP 1996)).

**31.** *See, e.g., In re Lang,* 414 F.3d 1191, 1201–02 (10th Cir.2005) ("The decision of whether to grant a stay pending appeal is ... review[ed] ... for an abuse of discretion"); *WCI Cable, Inc. v. Alaska R.R. Corp.,* 285 B.R. 476, 478 (D.Or.2002) ("The decision to grant or to deny a stay pending appeal of a bankruptcy court order rests in the discretion of the district court.") (citing *In re First South Sav. Ass'n,* 820 F.2d 700, 709 (5th Cir.1987)); *In re Overmyer,* 53 B.R. 952, 955 (Bankr. S.D.N.Y.1985) ("A motion for a stay pending appeal, as authorized under Bankruptcy Rule 8005, is discretionary.") (citing *In re Pine Lake Village Apartment Co.,* 21 B.R. 395, 398 (S.D.N.Y.1982)).

**32.** *Hirschfeld v. Board of Elections in the City of N.Y.,* 984 F.2d 35, 39 (2d Cir.1993) (quotation marks omitted). *Accord Mohammed v. Reno,* 309 F.3d 95, 100 (2d Cir.2002) (citing *Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987)); *In re Savage,* 2005 WL 488643, at *1; *In re Suprema Specialties, Inc.,* 330 B.R. 93, 94–95 (S.D.N.Y.2005).

the four factors on a motion for a stay pending appeal of a bankruptcy court order "dooms the motion." [33] However, the Second Circuit has never articulated such a rigid rule of law. To the contrary, the Second Circuit has consistently treated the inquiry of whether to grant a stay pending appeal as a balancing of factors that must be weighed. [34] This rift was recently noted, but not decided, by a district court in this circuit. [35] I will follow the Second Circuit's practice of weighing the factors. [36]

### 1. Irreparable Harm

■ "A showing of probable irreparable harm is the principal prerequisite for the issuance of a [Rule 8005] stay." [37] Irreparable harm must be "neither remote nor speculative, but actual and imminent." [38]

■ Courts are divided, and the Second Circuit has not yet spoken, on the issue of whether the risk that an appeal may become moot in the absence of a stay pending appeal satisfies the irreparable injury requirement. A majority of courts have held that a risk of mootness, standing alone, does not constitute irreparable harm. [39] However, several courts, including ones within this Circuit, have held to the contrary. [40] While Appellees have

---

**33.** *EPlus, Inc. v. Katz (In re Metiom, Inc.)*, 318 B.R. 263, 271 (S.D.N.Y.2004) ("failure to satisfy one prong of the standard ... dooms the motion"). *See also In re Tower Automotive, Inc.*, No. 05–10578, 2006 WL 2583624, at *1 (Bankr.S.D.N.Y. June 28, 2006) ("all four criteria must be satisfied to some extent before a stay is granted"); *In re Baker*, No. 05 Civ. 3487, 2005 WL 2105802, at *3 (E.D.N.Y. Aug. 31, 2005) (same).

**34.** *See Mohammed*, 309 F.3d at 101 (citing *Ofosu v. McElroy*, 98 F.3d 694, 703 (2d Cir. 1996) ("weighing the four factors relevant to the grant of a stay")); *Hirschfeld*, 984 F.2d at 39 (finding that "consideration of these [four] factors clearly would *weigh* against the granting of the requested stay" (emphasis added)).

**35.** *See In re Albicocco*, No. 06–CV–3409, 2006 WL 2620464, at *1 n. 2 (E.D.N.Y. Sept. 13, 2006) (collecting cases, but declining to decide the question of the appropriate standard of review because the stay "should be denied under even the more generous standard, which treats the criteria as factors to be balanced rather than elements that all have to be necessarily satisfied").

**36.** I note, however, that for the reasons discussed below, the result here would be the same even under the more stringent test.

**37.** *Rothenberg v. Ralph D. Kaiser Co.*, 200 B.R. 461, 463 (D.D.C.1996) (quotations omitted). *Accord Stern v. Bambu Sales, Inc.*, 201 B.R. 44, 46 (E.D.N.Y.1996) (denying stay pending appeal where movant failed to show irreparable harm).

**38.** *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir.1989) (quotation marks and citation omitted).

**39.** *See, e.g., In re Sunflower Racing, Inc.*, 223 B.R. 222, 225 (D.Kan.1998); *In re 203 N. LaSalle St. P'ship*, 190 B.R. 595, 598 (N.D.Ill. 1995); *In re Best Prods. Co.*, 177 B.R. 791, 808 (S.D.N.Y.), *aff'd on other grounds*, 68 F.3d 26 (2d Cir.1995); *In re Clark*, No. 95 C 2773, 1995 WL 495951, at *6 (N.D.Ill. Aug. 17, 1995); *In re Moreau*, 135 B.R. 209, 215 (N.D.N.Y.1992); *In re MAC Panel Co.*, No. 98–10952C–11G, 2000 WL 33673784, at *4 (Bankr.M.D.N.C.2000) (collecting cases); *In re Kent*, 145 B.R. 843, 844 (Bankr.E.D.Va. 1991); *In re Charter Co.*, 72 B.R. 70, 72 (Bankr.M.D.Fla.1987); *In re Great Barrington Fair & Amusement, Inc.*, 53 B.R. 237, 240 (Bankr.D.Mass.1985); *In re Baldwin United Corp.*, 45 B.R. 385, 386 (Bankr.S.D.Ohio 1984).

**40.** *See, e.g., In re Norwich Historic Pres. Trust, LLC*, No. 3:05CV12, 2005 WL 977067, at *3 (D.Conn.2005) (acknowledging "persuasive" arguments that although foreclosure sale would not injure appellant, appellant's concern that his appeal would be mooted satisfied the irreparable harm requirement); *In re Country Squire*, 203 B.R. at 183 (staying a foreclosure sale where it was "apparent that absent a stay pending appeal ... the appeal will be rendered moot," resulting in a "quintessential form of prejudice" to appellant (quotation omitted)); *In re St. Johnsbury Trucking Co.*, 185 B.R. 687, 690 (S.D.N.Y.

strained to distinguish each of these cases, the fact is that loss of appellate rights is a "quintessential form of prejudice." [41] Thus, where the denial of a stay pending appeal risks mooting *any* appeal of *significant* claims of error, the irreparable harm requirement is satisfied.

 Consequently, in evaluating the irreparable harm element, it is necessary to analyze the risk that an appeal would be mooted in the absence of a stay. The Second Circuit has held that "when, during the pendency of an appeal, events occur that would prevent the appellate court from fashioning effective relief, the appeal should be dismissed as moot." [42] Moreover, an appeal should also be dismissed as moot when, "even though effective relief could conceivably be fashioned, implemen-

tation of that relief would be inequitable." [43]

 Mootness of an appeal of a bankruptcy court order confirming a plan of reorganization under chapter 11 is presumed when the reorganization plan has been substantially consummated during the pendency of the appeal.[44] This presumption is rebutted only upon a showing of each of the following:

(a) the court can still order some effective relief; (b) such relief will not affect the re-emergence of the debtor as a revitalized corporate entity; (c) such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court; (d) the

1995) (finding sufficient irreparable injury where denying a stay would threaten government's ability to appeal a bankruptcy court's decision); *In re Advanced Mining Sys., Inc.,* 173 B.R. 467, 468–69 (S.D.N.Y.1994) (finding irreparable injury prong met where, absent a stay of the bankruptcy court's order, the distribution of assets to creditors would moot any appeal and thus quintessentially prejudice appellants); *In re Grandview Estates Assocs., Ltd.,* 89 B.R. 42, 42–43 (Bankr.W.D.Mo.1988) (declining to stay the foreclosure sale of an asbestos-ridden apartment complex, but holding that irreparable injury is clearly shown where such sales moot any appeal, and concluding that to hold otherwise would preclude appellate review, thus running "contrary to the spirit of the bankruptcy system [and also] subvert[ing] the entire legal process"). *Cf. In re "Agent Orange" Prod. Liab. Litig.,* 804 F.2d 19, 20 (2d Cir.1986) (declining to lift the court's own stay of the implementation of a district court's scheme for the distribution of a settlement award because the pending appeals "involve[d] numerous complex issues arising out of [ ] extraordinary litigation," the objecting parties had "a right to appellate review," and "[d]istribution of the challenged settlement award before its validity [could be] tested would deprive those parties of that right").

**41.** *In re Country Squire,* 203 B.R. at 183. The sanctity of Appellants' right to appellate review is not lessened because they represent a minority, in both number and priority of claims. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson ("TMT"),* 390 U.S. 414, 450, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968) (the rights of the lone committee objecting to a reorganization plan cannot be subjugated to those of the majority approving the plan).

**42.** *Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. Official Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.) ("Chateaugay I"),* 988 F.2d 322, 325 (2d Cir.1993).

**43.** *Id.* (stating that principles of mootness are "especially pertinent in bankruptcy proceedings, where the ability to achieve finality is essential to the fashioning of effective remedies"). *Accord In re Metromedia Fiber Network, Inc.,* 416 F.3d 136, 144 (2d Cir.2005).

**44.** *See Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.) ("Chateaugay III"),* 94 F.3d 772, 776 (2d Cir.1996) ("Reviewing courts presume that it will be inequitable or impractical to grant relief after substantial consummation of a plan of reorganization.").

parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings; and (e) the appellant pursue[d] with diligence all available remedies to obtain a stay of execution of the objectionable order ... if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from.[45]

The strong possibility of mootness based on substantial consummation of a bankruptcy plan means that absent a stay of an order confirming a plan of reorganization pending appeal, many bankruptcy court confirmation orders will be immunized from appellate review even if the remaining stay factors are satisfied.

### 2. Harm to Non–Moving Party

In addition to showing irreparable harm, the party seeking a stay must also establish that the non-moving party or other parties will not suffer substantial harm if the stay is granted.[46] In other words, the moving party must show that the balance of harms tips in favor of granting the stay.[47]

### 3. Degree of Showing on the Merits

■ "'The necessary "level" or "degree" of possibility of success will vary according to the court's assessment of the other [stay] factors.'"[48] The requisite showing of "substantial possibility" of success is "inversely proportional to the amount of irreparable injury plaintiff[ ] will suffer absent the stay."[49] "Simply stated, more of one excuses less of the other."[50] "[T]he movant need not always show a 'probability of success' on the merits; instead, the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay."[51]

### 4. Public Interest

The "public interest favors the expedient administration of the bankruptcy proceedings."[52] Indeed, compromises are favored in bankruptcy precisely for the reason that they "minimize litigation and expedite the administration of a bankruptcy estate."[53] However, "[p]arties objecting to [a] settlement and [ ] distribution scheme have a right to appellate review ... [and] [d]istribution of the challenged settlement award

---

**45.** *Frito–Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.) ("Chateaugay II")*, 10 F.3d 944, 952–53 (2d Cir.1993) (citations and quotations omitted).

**46.** *See, e.g., Mohammed*, 309 F.3d at 100.

**47.** *See, e.g., id.; Bermudez v. Reid*, 720 F.2d 748, 750 (2d Cir.1983).

**48.** *Mohammed*, 309 F.3d at 101 (quoting *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977)).

**49.** *Id.* (quoting *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir.1991)). *Accord Ofosu*, 98 F.3d at 703 (four stay factors "weigh[ed]").

**50.** *Id.*

**51.** *LaRouche v. Kezer*, 20 F.3d 68, 72–73 (2d Cir.1994) (quotation omitted). *Accord Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir.1953) (on a motion for preliminary injunction, stating that if "the balance of hardships tips decidedly toward plaintiff," the movant plaintiff will meet its burden on the merits if "the plaintiff has *raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.*" (emphasis added)).

**52.** *In re Savage*, 2005 WL 488643, at *2.

**53.** *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir.1996).

**350**

before its validity has been tested would deprive those parties of that right." [54]

### 5. Bond

■ Under Bankruptcy Rule 8005, a district court has the discretion to grant a stay of a judgment, order or decree of a bankruptcy judge without the posting of a supersedeas bond.[55] In determining whether a bond should be ordered, the court looks to whether the bond would be necessary to protect "against diminution in the value of property pending appeal" and to "secure the prevailing party against any loss that might be sustained as a result of an ineffectual appeal." [56] Moreover, the posting of a bond "guarantees the costs of delay incident to the appeal." [57] In analyzing whether to order movants to post a bond in support of a stay pending an appeal of a bankruptcy court order, district courts have obtained guidance from Federal Rule of Civil Procedure 62(d),[58] which requires appellants to post a bond when appealing a lower court order absent "exceptional circumstances." [59] The policy behind ordering the posting of a bond in that context was recently articulated by this Court:

> Because a supersedeas bond is designed to protect the appellee, the party seeking a stay without bond has the burden of providing specific reasons why the court should depart from the standard requirement of granting a stay only after posting of a supersedeas bond in the full amount of the judgment. The bond requirement should not be eliminated or reduced unless doing so "does not unduly endanger the judgment creditor's interest in ultimate recovery." [60]

The same reasoning applies when a district court is called upon to exercise its discretion as to whether to require a bond in

---

**54.** *In re Agent Orange,* 804 F.2d at 20.

**55.** *See* Fed. R. Bankr.P. 8005 ("A motion for a stay of the judgment, order, or decree of a bankruptcy judge, for approval of a supersedeas bond, or for other relief pending appeal must ordinarily be presented to the bankruptcy judge in the first instance.... The district court or the bankruptcy appellate panel may condition the relief it grants under this rule on the filing of a bond or other appropriate security with the bankruptcy court."). *Accord In re Suprema Specialties, Inc.,* 330 B.R. 93, 96 (S.D.N.Y.2005)("the posting of a bond ... is discretionary and is not a prerequisite to obtain a stay pending appeal."); *In re Sphere Holding Corp.,* 162 B.R. 639, 644 (Bankr. E.D.N.Y.1994) ("Bankruptcy Rule 8005 provides in relevant part that the '[t]he district court ... may condition the relief it grants under this rule on the filing of a bond or other appropriate security with the bankruptcy court.' The posting of a bond, therefore, is discretionary.") (quoting 9 Collier on Bankruptcy ¶ 8005.07[2] (Lawrence P. King ed., 15th ed.1993)); *In re Max Sugarman Funeral Home, Inc.,* 94 B.R. 16, 17 (Bankr.D.R.I.1988) ("[T]he form, the amount, and the sufficiency of the bond generally[ ] are matters within the

discretion of and for determination by the bankruptcy court.") (citing *In re Swift Aire Lines, Inc.,* 21 B.R. 12, 14 (9th Cir. BAP 1982)).

**56.** *In re Sphere Holding,* 162 B.R. at 644 (quoting 9 Collier on Bankruptcy ¶ 8005.07[2] ).

**57.** *In re Suprema Specialties,* 330 B.R. at 96 (declining to impose a bond, but stating that if the stay would have delayed payment to creditors, "a bond should be required to guarantee the costs of delay incident to [the] appeal").

**58.** *See id.*

**59.** *State Indus., Inc. v. Mor–Flo Indus., Inc.,* 124 F.R.D. 613, 614 (E.D.Tenn.1988) (bond required unless appellant can show "undue financial burden or other exceptional circumstances").

**60.** *de la Fuente v. DCI Telecomm., Inc.,* 269 F.Supp.2d 237, 240 (S.D.N.Y.) (quoting *Morgan Guar. Trust Co. v. Republic of Palau,* 702 F.Supp. 60, 65 (S.D.N.Y.1988)), *aff'd,* 82 Fed. Appx. 723, 2003 WL 22922353 (2d Cir.2003) (unpublished).

support of a stay of an order of a bankruptcy court. If a stay pending appeal is likely to cause harm by diminishing the value of an estate or "endanger [the non-moving parties'] interest in the ultimate recovery," and there is no good reason not to require the posting of a bond, then the court should set a bond at or near the full amount of the potential harm to the non-moving parties.

## III. DISCUSSION

### A. Irreparable Harm to Appellants

In the absence of a stay, this Plan will take effect and the distributions will be made, thereby substantially consummating the Plan.[61] Thus, there is a very strong likelihood that any appeal will be moot.

Appellees do not argue otherwise. Once the distributions are made pursuant to the Plan, it will become impracticable to ever fashion effective relief for Appellants.[62] In letter briefs to this Court, the parties addressed the feasibility of a disgorgement remedy upon the hypothetical reversal of an unstayed confirmation order. In support of disgorgement, Appellants contend that disgorgement is "[w]orkable with [p]rotections," and cite to a single chapter 11 case where the bankruptcy court permitted approximately $213 million in disputed funds to be distributed to holders of notes, subject to disgorgement.[63] In the alternative, Appellants ask the Court to "authorize the debtors to make 'interim distributions' on secured and unsecured claims."[64]

In opposition, Appellees argue, persuasively, that notwithstanding the "array of novel and complex" jurisdictional and practical questions raised by the idea of disgorging distributions, once 111 million shares of freely tradeable TWC Stock are distributed to 14,000 parties, and more than 9.4 billion CVV Interests and $7.136 billion in cash are distributed to over 10,000 parties, disgorgement becomes, for all intents and purposes, impossible.[65] Once set in motion, the Plan truly cannot be unraveled. Any attempt to do so is proscribed by *Chateaugay II*, as it would, without a doubt, "knock the props out from

---

**61.** It is undisputed that the distributions, once made, would constitute substantial consummation.

**62.** *See Chateaugay II*, 10 F.3d at 952–53 (holding that in order to rebut the presumption of mootness of an appeal of a bankruptcy court-approved confirmation plan, appellant must show that effective, practical relief is possible).

**63.** 1/19/07 Letter from Martin J. Bienenstock at 2–3 (citing *In re Kaiser Aluminum Corp.*, No. 02–10429 (Bankr.D.Del. Mar. 3, 2006) (Docket No. 8370) (requiring each noteholder receiving a distribution to execute an affidavit agreeing to return all distributions within thirty days after notification of the entry of a final order reversing the distribution on appeal)).

**64.** *Id.* at 3.

**65.** 1/19/07 Letter from Marc Abrams and Adam L. Shiff, counsel to the Debtors and the

Creditors Committee, respectively, at 1. The ACC Bondholder Group's main objection to the Plan is that the entire class of ACC Senior Noteholders is to receive an 89% recovery whereas most of the creditor groups will receive a substantially greater percentage (*e.g.*, 112% for the Arahova Noteholders). This occurred, they claim, because the merits of the Inter–Creditor Dispute were never tried nor even carefully evaluated. *See infra* Part III. C.2. Under the current Plan, however, the difference between an 89% and 112% recovery is approximately $250 million—excluding the value of the CVV interests, which is dependent on the eventual recovery, if any, in the Bank Litigation. Nevertheless, counsel for the ACC Bondholder Group conceded at oral argument that $250 million is "an approximation of a high side benefit if we win here for my clients." 1/17/06 Transcript of Hearing on Motion for Stay Pending Appeal, at 16.

under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation."[66]

▪ In sum, it is overwhelmingly likely, even without analyzing the remaining *Chateaugay II* factors, that any appeal of the Confirmation Order after implementation of the Plan would be dismissed as moot.[67] Thus, Appellants have made a showing that they will suffer irreparable harm in the absence of a stay.[68]

### B. Harm to the Non–Moving Parties in the Absence of a Stay

Even assuming that the appeal is expedited, it is very likely that full appellate review would not be complete until September 2007 at the earliest.[69] Appellees list a host of harms that could befall all parties in interest if the Plan is stayed in the interim. *First*, Appellees cite the interest that is accruing on Debtors' combined postpetition debt (bank and non-bank debt). This interest, even after sub-tracting the interest earned on the proceeds from the Sale,[70] amounts to $70 million per month, or $2.4 million *per day*. Assuming the stay lasts for at least those seven months, the interest amounts to a quantifiable harm of $490 million. Appellants argue that harm resulting from the accrual of interest is avoidable because the principal of the bank debt could be paid at any time. It is not that simple. As Appellees point out, paying the banks gives the banks the very thing for which they bargained and made economic concessions during settlement negotiations. If the banks get what they want, they will have no further incentive to return to the negotiating table if necessary. Likewise, the repayment of the bank debt is a precondition (*i.e.*, a trigger) for various parties' payments pursuant to the Plan. Thus, repayment of the bank debt before the Plan goes effective could easily start the unraveling of a carefully negotiated and constructed plan. As such, repayment of the bank debt is not a reasonable course of

66. 10 F.3d at 953 (quotations omitted).

67. Indeed, the Bankruptcy Court reached the very same conclusion. *See* Bench Dec. at 253 (analyzing the irreparable harm to the moving party factor, stating "I assume it to be true that if a stay isn't granted, the Plan will go effective, and that if that happens, there is a very high probability that any appellate court would then find an appeal to be moot. And I assume, without deciding, that the irreparable injury requirement could thus be deemed to be satisfied.").

68. Although the loss of appellate rights is dispositive for this factor, it is not dispositive of the ultimate question of whether to grant a stay pending appeal. While I place the highest value on the exercise of appellate rights, there is no doubt that the parties seeking appellate review here do so purely for the purpose of acquiring more money. The right to appeal a loss of even hundreds of millions of dollars is surely less urgent, for example, than the loss of liberty. *Cf. In re St. Johnsbury Trucking Co.*, 185 B.R. at 690 n. 1 (con-cluding that the risk of the government's appeal being mooted satisfied the irreparable injury requirement only because mootness would preclude the government from, *inter alia*, enforcing provisions of federal law; it was "that threatened loss rather than the loss of the right to appeal *vel non* that [gave] rise to the Court's irreparable injury finding").

69. Assuming that the appeal before the district court could be fully briefed by the end of February (assuming there is no appeal from the decision on the stay), it would likely take two months (until the end of April) to decide. An appeal to the Second Circuit would likely take an additional four months (until September). Any petition for review to the Supreme Court would extend the time even further.

70. There is also an inherent loss to the creditors in any delay because the interest on the proceeds from the Sale earned by Debtors accrues at a very low rate. If the funds were distributed to the various creditors, many of which are hedge funds, they could likely achieve much higher rates of return.

action and the accrual of interest is a real and significant harm that must be considered.

*Second,* Appellees stress the harm that could result if the IPO is triggered. As discussed above, the Purchase Agreements for the Sale between the Debtors and the Buyers provide that if a plan is not confirmed by the IPO Deadline (ninety days after the registration statement is approved by the SEC), the Debtors will be forced to conduct an IPO of at least one-third of the TWC stock. The registration approval process is already underway and may be complete at any time. And ninety days is the *longest* that the Debtors can wait to conduct the IPO after approval of the registration statement. Once the statement is approved, the Debtors very well may have a fiduciary duty to conduct the IPO sooner than ninety days given the current volatility of the cable market. Indeed, in the course of the last nine months of 2006 the value of the TWC stock fluctuated by as much as $1.75 billion. Thus, if a stay is granted (*i.e.,* the Plan is *not* consummated), it may be prudent to conduct the IPO as soon as possible in order to take advantage of the fact that TWC stock is currently trading at its peak.[71] It cannot reasonably be disputed that an IPO will occur during the stay, whether as a matter of contract obligation or fiduciary obligation.

The attendant costs associated with an IPO are substantial. These costs can be broken down into two categories: (1) the "IPO discount," defined as the market perception that an IPO issuer must offer its shares at a discount in order to induce investor interest, which the Bankruptcy Court estimated to be seven percent; and (2) the underwriting fees, which the Bankruptcy Court estimated to be four percent. Assuming the stock is worth $6.5 billion (although it is currently worth closer to $6.7 billion), if the IPO were to go forward during a stay, $455 million would be lost due to the IPO discount, and another $260 million would be lost in underwriting fees, with total harm to the estate approaching $715 million.[72]

*Third,* less substantial but far from trivial are the continuing professional and audit expenses as well as expenses associated with remaining a public company during the pendency of a stay. Professional fees have been accruing at the rate of $10 million per month in these cases. Although it is unclear what fraction of those costs have abated as a result of the confirmation of the Plan, various incremental costs will certainly continue to accrue, such as the costs of continuing to litigate the confirmation issues. In addition, if a stay is issued, ACC will be required to audit its 2006 financial statements in order to file a 10–K statement by the end of the first quarter of 2007. The fees associated with that event are estimated to be $12.4 million.[73]

---

71. Indeed, if the Debtors did not immediately pursue an IPO given the current hot market, that could send a signal to the market that there is a problem with the stock that is for some reason delaying the IPO process, which could negatively affect the TWC stock price.

72. Appellants claim that these fees are overestimated because the IPO Condition requires that only one-third of the TWC stock be sold in the IPO. However, Appellees counter that if less than all of the stock is sold, the remainder of the stock would be subject to the agree-

ments' 180–day lockup period during which the Debtors would be prohibited from distributing the balance of the stock under the Plan, thereby subjecting the creditors to the volatility of the marketplace and depriving them of the right to make their own investment decisions with respect to the stock.

73. Appellees also point out that many of the key personnel that were working for the Debtors to implement the Plan are no longer so employed, and a renegotiation of the Plan if that becomes necessary and further day-to-

*Fourth*, there are additional harms that are substantial but not easily quantifiable, such as the risk that the Plan will fall apart and that the parties will fail to reach a new agreement given the uncertainty associated with what could be a seven-month stay. If the Plan falls apart, there is a risk that the Inter–Creditor Dispute will not settle and the parties will be faced with years of protracted litigation. That being said, the risk of implosion is minimal given that all the parties have a strong interest in seeing these disputes settled.[74] There are also some risks associated with the CVV that are not easily quantifiable. The CVV Interests are designed to be tradeable interests and their value depends, in part, on the ability of the CVV to take control of the Bank Litigation now, rather than seven months from now.

At bottom, the potential harm to the non-moving is value-erosion resulting in a decreased distribution. Thus, if Appellees are protected from such potential losses by an adequate bond, they will not risk or suffer substantial harm.[75] Because this Court would condition a stay on the post-ing of a substantial bond, the potential financial harm to the non-movants does not weigh against a stay in this case.[76]

## C. Substantial Possibility of Success on the Merits

The ACC Bondholders raise eight separate claims of error on the part of the Bankruptcy Court. Based solely on the briefing of the motion for a stay pending appeal, I find that there are several claims on which Appellants have shown a substantial possibility of success on appeal.[77]

### 1. Appellants Have Shown a Substantial Possibility of Success on Their Claim that the Bankruptcy Court Erroneously Approved an Invalid Settlement and Erroneously Permitted Its Inclusion in the Plan

██ On July 26, 2005, the Bankruptcy Court held that various unofficial creditors' committees would be authorized to litigate the Inter–Creditor disputes on behalf of the Debtors' estates through *Commodore* standing.[78] On August 4, 2005, the court

---

day administration of the estate during the stay would place a heavy burden on the remaining "wind down" staff.

74. This is borne out by the record. For example, several "drop dead" dates have passed and new ones have been set and still no party has attempted to abandon the Plan. Hopefully, too much is now at stake to allow that to happen.

75. *See infra* Part III.F.

76. *Cf. Borey v. National Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir.1991) (noting in the preliminary injunction context that "[m]onetary loss alone will generally not amount to irreparable harm. 'A monetary loss will not suffice unless the movant provides evidence of damage that cannot be rectified by financial compensation.'" (quoting *Tucker Anthony Realty Corp.*, 888 F.2d at 975)). There is no inconsistency between this Court's finding

that Appellants will suffer irreparable harm absent a stay and the fact that their true purpose in appealing is to obtain more money. The reason why monetary loss is not irreparable harm in the preliminary injunction context is because the party seeking an injunction may yet obtain monetary relief after the merits are heard. Here, by contrast, Appellants' alleged loss will never be recouped if they do not obtain a stay because their appeal will be moot and the merits will never be heard.

77. Other than the points discussed below, Appellants' remaining claims of error are either "de minimis" or unlikely to succeed on appeal, and thus, do not merit further discussion. *See infra* Part III.C.5.

78. *See* Ex. 164 (7/26/05 Transcript of Hearing ("July Hr'g")), at 295 ("The Debtors' approach is much more efficient and comprehensive and is fully consistent with the due

memorialized in the MIA Order what was already outlined in the July 26, 2005 hearing, namely that the ACC Noteholders Committee would be a deputized "Participant" in the MIA Litigation (*i.e.*, the Inter–Creditor Dispute).[79] Indeed, there seems to be no dispute that the ACC Noteholders Committee took advantage of that authorization and clearly "carr[ied] the sword" for the ACC Debtor in the Inter–Creditor Dispute.[80] In that same MIA Order, the court noted that while the Debtors were free to "seek[ ] to compromise" any of the Disputed Issues (*i.e.*, the Inter–Creditor Dispute), such a proposal would not "prejudice the rights of any Participant to object to any such compromise and/or to assert that the Debtors have no authority to compromise such claims."[81] On January 23, 2006, the Bankruptcy Court again confirmed, in a published opinion, that it had previously approved the right of the various committees, including the ACC Noteholders Committee, to litigate the disputes among the Debtors' estates (*i.e.*, the Inter–Creditor Dispute).[82] Finally, on April 6, 2006, the court ordered that whereas the Debtors are authorized to propose a plan that includes a settlement of the Inter–Creditor Dispute, they can do so only on the condition that (among others) the Plan "be structured to permit creditors to separately accept or reject (i) the Plan including the proposed settlement, and (ii) the Plan excluding the proposed settlement . . ." (the "April 6 Order").[83] The April 6 Order also provided that the Debtors' authority to propose a Plan was "without prejudice" to any party's rights in the resolution of the Inter–Creditor Dispute and the prosecution or confirmation of any plan of reorganization.[84] Appellants' primary objection to the Confirmation Order is that those conditions were not met.

What this history shows is that the Bankruptcy Court gave the various Creditor Committees (including the ACC Noteholders Committee) the authority (via *Commodore* standing) to litigate the Inter–Creditor Dispute. It is beyond cavil that this includes the authority to settle those disputes. However, that authority may not have been exclusive—the ACC Noteholders Committee's consent to settle may not have been sufficient, but certainly was necessary.

The court-appointed mediator, another Bankruptcy Judge in this District, met with the various constituencies in an effort to reach a settlement of all of these dis-

---

process rights of the Arahova noteholders in the world of the Second Circuit in Commodore, which applied STN in a situation where the debtor consented to the deputization of an estate representative."). *See also Commodore Int'l Ltd. v. Gould (In re Commodore Int'l Ltd.)*, 262 F.3d 96 (2d Cir.2001).

The Bankruptcy Court also noted that the framework of *Commodore* standing for deputized committees and Debtor neutrality is "essential to permit a full and fair litigation of the intercreditor issues ... consistent, of course, with due process" and "would ensure that [the Inter–Creditor Disputes] were appropriately litigated without requiring the Debtors to choose sides between one competing creditor group or another." July Hr'g at 289, 292.

**79.** *See* MIA Order ¶¶ 3(a), 3(f).

**80.** Bench Dec. at 165.

**81.** *See* MIA Order ¶ 12(a).

**82.** *See In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 618 (Bankr.S.D.N.Y.), *aff'd*, 342 B.R. 122 (S.D.N.Y.2006). There can be little doubt that the right to litigate a cause of action must include the right to withdraw it, settle it or try it—every case must be "dropped, settled or tried." *United States v. Glens Falls Newspapers, Inc.*, 160 F.3d 853, 856 (2d Cir.1998).

**83.** April 6 Order ¶ 3.

**84.** *Id.* ¶ 4(b).

putes. Most of the Participants, as defined in the MIA Order, approved the Settlement that resulted from that mediation. But the ACC Noteholders Committee, *the court-authorized litigant representing the ACC Debtor,* never approved that Settlement. Instead, only two of its twenty-three members originally signed the Settlement. When those two creditors brought it back to the ACC Noteholders Committee for a vote, the Committee voted it down. Under the holding in *Smart World Technologies, LLC v. Juno Online Services, Inc. ("In re Smart World Technologies, LLC"),*[85] those two individual creditors had no authority to act on behalf of the ACC Debtor. It must be remembered that it was the ACC Noteholders Committee—not each individual member of that Committee—that was authorized to act on behalf of the ACC Debtor. Thus, in the absence of the approval of that Committee, the authorized litigant for ACC had not agreed to the Settlement.[86]

In addition, the incorporation of the so-called Settlement in the proposed Plan, to be distributed to all creditors for their vote, diluted the ACC Noteholders Committee's ability to exercise its right to object to the Settlement and/or to assert that the Debtors lacked authority to settle those disputes—rights that were explicitly

reserved to them in the MIA Order. While it is true that the Committee could and did object to confirmation of the Plan (as opposed to the Settlement) at a later date, it then faced an up-hill battle based on the fact that the majority of creditors had accepted the Plan (which included the purported Settlement).[87]

Perhaps most troubling of all, however, is the Plan Proponents' failure to comply with the Bankruptcy Court's April 6 Order and the Bankruptcy Court's failure to enforce that Order. Once the so-called Settlement was reached, it was incorporated in the Plan, which was proposed to the creditors without offering them an alternative plan that did not include that Settlement, in direct violation of paragraph 3 of the April 6 Order. Moreover, the Settlement clearly foreclosed the rights of the ACC Noteholders Committee in the resolution process, in that the MIA Litigation was effectively terminated without their consent, again in direct violation of the April 6 Order.[88]

The non-consenting members of the ACC Noteholders Committee raised these very objections at the Confirmation Hearing. In addressing these objections, the Bankruptcy Court first declared that the Committee was "dysfunction[al]" apparent-

---

**85.** 423 F.3d 166 (2d Cir.2005).

**86.** Appellees note that this unofficial committee had no by-laws. Thus, it is unclear what level of support would have been required to approve the Settlement on behalf of the Committee. In other words, must the Committee act unanimously, by super majority, or a simple majority. In any event, the record seems clear that not even a simple majority approved the Settlement.

**87.** Thus, the Bankruptcy Court's recitation that certain parties "had the right to object to any such compromise (which the ACC Bondholder Group has done), and/or to assert that the Debtors have no authority to compromise

such disputes ... [which] [t]he ACC Bondholder Group has also done" misses the point. Bench Dec. at 161. These objections were made after the Plan—which included the Settlement—had been overwhelmingly approved by the creditors.

**88.** *See* April 6 Order ¶ 4. Indeed, given that the requirement in the April 6 Order that the Plan be offered without the settlement as an option was never satisfied, the voting creditors were in essence voting up or down on one choice, rather than choosing between two alternatives. This, together with the incentives of voting for the plan (namely full releases and exculpation), *see infra* Part III.C.3, may well have artificially inflated the vote.

ly because only two (later five) of its members supported the settlement, while the majority of the others did not.[89] Relying on *Smart World,* the court then found that the objections were meritless, because the Debtor always retains the authority to settle an estate's claims. This literal reading of *Smart World,* however, ignores the facts of both that case and this bankruptcy proceeding. In *Smart World,* the settling creditors *had no authority* to act on behalf of the Debtor. Here, the ACC Noteholders Committee (of which the objecting creditors were members) had been given the authority to settle claims, thus acting as a proxy for the Debtor. By contrast, the Debtor here had retained only limited authority to *propose* a settlement under clearly articulated conditions. Thus, just as the two creditors in *Smart World* could not settle the claims out from under the Debtor, two individual creditors (acting without court authority) could not settle the claims out from under the ACC Noteholders Committee, acting on behalf of and in place of the Debtor.[90]

Given the violations of both the MIA Order and the April 6 Order, and the fact that the ACC Noteholders Committee did not approve a settlement of the claims they were authorized to litigate and to settle, the Appellants have shown a substantial possibility that a reviewing court could find that the Settlement was not truly a settlement.

The consequences of such a finding are very significant. *First,* if a reviewing court were to find that there was never a settlement, the necessary result would be that the Bankruptcy Court made an error of law in reviewing whether the Settlement is in the best interests of the estate. Ordinarily an appellate court would review the Bankruptcy Court's approval of a settlement for abuse of discretion, reversing only if the settlement falls below the lowest point in the range of reasonableness.[91] The Bankruptcy Court's decision to approve the Settlement must be reviewed de novo if accepting the Settlement was erroneous as a matter of law. In reviewing the Settlement, the Bankruptcy Court explicitly applied the standard set forth by the Supreme Court in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson ("TMT"),* that the settlement must be "fair and equitable," [92] which requires only that the Bankruptcy Court "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.' " [93] Because Appellants have shown a substantial possibility that there was never a settlement agreed to by all authorized litigants, there is also a substantial possibility that the appellate court, in its de novo review, would find that the Bankruptcy Court erred in approving the Settlement.[94]

89. Bench Dec. at 165. *See also* Appellants' Rep. Mem. at 10 (citing Pike Aff.). It is unclear from the record how the vote was split among the members. Despite the ACC Noteholders Committee's rejection, three more members negotiated a slight improvement and signed the Settlement in their individual creditor capacity.

90. The fact that the Debtors agreed to settle is immaterial. The Debtors were ordered to remain neutral and the authority to litigate and settle (for the ACC Debtor) was vested in the ACC Noteholders Committee. That Committee never approved the settlement.

91. *See In re W.T. Grant Co.,* 699 F.2d 599, 608 (2d Cir.1983).

92. 390 U.S. at 424, 88 S.Ct. 1157.

93. *In re W.T. Grant Co.,* 699 F.2d at 608 (quoting *Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.1972)).

94. Moreover, when analyzing the ACC Noteholders' recovery in the Settlement of nearly

*Second,* based on the substantial possibility that a reviewing court might conclude that there was no settlement and/or that it was improperly approved by the Bankruptcy Court as a settlement, there is also a corresponding substantial possibility that the Bankruptcy Court erred, as a matter of law, in confirming the Plan given that the purported Settlement was an integral part of that Plan.

The heart of this issue of law is found in section 1123(b)(3) of the Bankruptcy Code. Appellees place great weight on this section as support for their argument that the so-called Settlement, even if not approved by the authorized litigants, could be included in the Plan and put up for a creditor vote. This argument puts the cart before the horse. Section 1123(b)(3) does indeed provide that a plan may include "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." [95] It does not provide, however,

that a *proposed* settlement that has not been authorized by the necessary parties can be included in a plan. Thus, if the reviewing court finds that there was no settlement, section 1123 does not permit it to be included in the Plan.[96]

■ Given the apparent loss of very valuable rights to control the litigation that it was authorized to prosecute, Appellants have shown, at the very least, that they have a substantial possibility of success in overturning the Confirmation Order. Permitting the Plan to go effective as confirmed—thereby distributing the finite estate to the creditors and taking away forever the rights of Appellants to pursue the Inter–Creditor Dispute that a reviewing court might well find they had never agreed to compromise [97]—could be a fundamental violation of Appellants' constitutional due process rights.[98]

89% under the lowest range of reasonableness standard, the Bankruptcy Court likely erred in its analysis of the possible recovery range for ACC Noteholders in the MIA Litigation. In determining the upside potential to ACC Noteholders to be 112.9%, the court used a $6.48 billion valuation of the TWC stock. *See* Bench Dec. 176–77. But in arriving at the low end of 53.7, the court erroneously relied on a valuation of the TWC stock in the range of $5.1 to $5.4 million. Had the 6.48 billion valuation been used, the low end would have been 73.3%—this is an underestimation of twenty basis points. *See id.; see also* Appellants' Mem. at 10–11. Appellees do not dispute this error, but speculate that the court would have reached the same result even in the absence of that error. *See* Plan Proponents' Memorandum of Law in Opposition to the ACC Bondholder Group's Motion for Stay Pending Appeal and Expedited Appeal ("Appellees' Mem.") at 26 n. 23. Nevertheless, there is a substantial possibility that a reviewing court would disagree and find that the Bankruptcy Court abused its discretion when it relied on erroneous material facts in approving the Settlement as falling within the range of reasonableness.

**95.** 11 U.S.C. § 1123(b)(3)(a).

**96.** Section 1123(b)(6) states that a plan may "include any other appropriate provision not inconsistent with the applicable provisions of this title." However, if the purported Settlement is unenforceable, it should not be included in the Plan under 1123(b)(6). The subsections of section 1123 must be applied as to give meaning to the section as a whole.

**97.** *See* April 6 Order ¶ 4(b) (ordering that any proposal of settlement made by the Debtors shall be "without prejudice to any party's rights (i) in the Resolution Process [of the Inter–Creditor Dispute] and/or (ii) with respect to the prosecution or confirmation of any plan or plans of reorganization").

**98.** In order for the implementation of the Bankruptcy law to be constitutional, it must provide for a fair distribution of assets to a debtor's creditors. *See Kuehner v. Irving Trust Co.,* 299 U.S. 445, 451, 57 S.Ct. 298, 81 L.Ed. 340 (1937). For the reasons detailed above, approval of the Settlement could be found to be fundamentally unfair. *See supra* Part III.C.1.

## 2. Appellants Have Shown a Substantial Possibility of Success on Their Claim that the Bankruptcy Court Erroneously Approved an Improper Substantive Consolidation and Unfairly Treated the Intercompany Claims

 Substantive consolidation "is a product of judicial gloss." [99] It "has the effect of consolidating the assets and liabilities of multiple debtors and treating them as if the liabilities were owed by, and the assets held by, a single entity." [100] It "usually results in, *inter alia,* pooling the assets of, and claims against, [multiple] entities; satisfying liabilities from the resultant common fund; eliminating intercompany claims; and combining the creditors of the [multiple] entities for purposes of voting on reorganization plans." [101] Although a bankruptcy court's power to effect a substantive consolidation stems from its general equitable powers,[102] it may do so only upon making a determination that substantive consolidation would "ensure the equitable treatment of all creditors." [103] Such a determination is appropriate where one of two "critical factors" exists: (i) the creditors dealt with the debtors as "a single economic unit and did not rely on their separate identity in extending credit;" or (ii) the "affairs of the debtors are so entangled that consolidation will benefit all creditors." [104] Consolidation should be undertaken deliberately and " 'sparingly,' " [105] for it is " 'a measure vitally affecting substantive rights.' " [106]

The parties agree that the Bankruptcy Court did not expressly undertake to analyze and make a finding that the Plan effects a substantive consolidation.[107] Rather, Appellants argue that the Bankruptcy Court improperly approved a Plan that implicitly imposes substantive consolidation and ignores the integrity of each Debtor's separate estate.[108] In other words, Appellants challenge the Confirmation Order because the Bankruptcy Court summarily approved, for the sake of administrative convenience,[109] a Plan that ef-

**99.** *In re Augie/Restivo Baking Co. ("Augie/Restivo"),* 860 F.2d 515, 518 (2d Cir.1988).

**100.** *In re Worldcom, Inc.,* No. 02–13533, 2003 WL 23861928, at *35 (Bankr.S.D.N.Y. Oct. 31, 2003) (citing *Federal Deposit Ins. Co. v. Colonial Realty Co.,* 966 F.2d 57, 59 (2d Cir. 1992)).

**101.** *Augie/Restivo,* 860 F.2d at 518 (citing 5 Collier on Bankruptcy ¶ 1100.06, at 1100–32 n. 1 (Lawrence P. King ed., 15th ed.1988)).

**102.** *See* 11 U.S.C. § 105. *See also Augie/Restivo,* 860 F.2d at 518 n. 1.

**103.** *Augie/Restivo,* 860 F.2d at 518.

**104.** *Id.* (citations omitted). *Accord In re 599 Consumer Elecs., Inc.,* 195 B.R. 244, 248 (S.D.N.Y.1996) ("[T]he Second Circuit's use of the conjunction 'or' suggests that the two cited factors are alternatively sufficient criteria.").

**105.** *Augie/Restivo,* 860 F.2d at 518 (quoting *Chemical Bank New York Trust Co. v. Kheel,* 369 F.2d 845, 847 (2d Cir.1966)).

**106.** *Id.* (quoting *Flora Mir Candy Corp. v. R.S. Dickson & Co.,* 432 F.2d 1060, 1062 (2d Cir. 1970)).

**107.** Indeed, the Bankruptcy Court actually stated that substantive consolidation would be unavailable under the circumstances because it would not meet the *Augie/Restivo* requirements. *See* Bench Dec. at 137 ("As the ACC Bondholders recognized in their supplemental solicitation material, substantive consolidation would be 'a highly unlikely result,' given that the Debtors have issued restated financial statements and filed the May 2005 Schedules, 'thus evidencing an ability to generally determine the assets and liabilities of each Debtor.' ") (citation omitted).

**108.** *See* Appellants' Mem. at 14–15.

**109.** *See Augie/Restivo,* 860 F.2d at 518 (stating that the "sole purpose" of substantive consolidation is to ensure creditors' equitable treatment and "stress[ing] that substantive consolidation 'is *no mere instrument of procedural*

fected a *de facto* substantive consolidation.[110]

The Plan provides that the "treatment of Claims against . . . the Debtors under this Plan represents, among other things, the settlement and compromise of the Inter–Creditor Dispute pursuant to the Global Settlement." [111] The Plan further provides that "Intercompany Claims shall be deemed resolved as a result of the settlement and compromise embodied in this Plan and therefore holders thereof shall not be entitled to vote on the Plan, or receive any Plan Distribution or other allocations of value." [112] The section of the Plan dealing with distributions to ACC creditors makes no mention of how the Intercompany Claims were resolved and how that affects the distributions—it merely recites how much each group of creditors receives.[113]

 Neither the Plan nor the Confirmation Order identifies each individual Debtor's assets and liabilities and how they are being distributed pursuant to the Plan. Moreover, the Plan does not identify how each of the issues in the Inter–Creditor Dispute (including the Intercompany Claims, fraudulent conveyance claims and other inter-debtor disputes) were resolved

in the purported Settlement. Indeed, ACC's Chief Financial Officer, Vanessa Wittman, testified that one "would not be able to go through the numerous issues [of the Inter–Creditor Dispute] and decide which [ ] issues went in favor of which group." [114] In the Confirmation Order, the Bankruptcy Court made no real attempt to ascertain the validity or value of the Intercompany Claims in its review of the Plan, instead stating that many of them "could go either way." [115] Given the failure of the Plan or the Bankruptcy Court to shed light on how the Intercompany Claims were resolved, there is a substantial possibility that a reviewing court would find that the Bankruptcy Court erred as a matter of law in confirming the Plan without making a "determination of what assets are subject to the payment of the respective claims." [116] Thus, a reviewing court would likely find that the Bankruptcy Court's confirmation of the Plan violated Appellants' constitutional right to a fair distribution of ACC's assets.[117]

Further, the Plan essentially wipes out the Intercompany Claims. They are given no vote, no distribution, no rights whatsoever. Appellees' attempt to label that treatment as the result of a negotiated settlement, rather than an improper sub-

---

convenience' " (emphasis added) (quoting *Flora Mir Candy Corp.*, 432 F.2d at 1062)).

**110.** Whether the Bankruptcy Court properly analyzed the Settlement and the treatment of the Intercompany claims are issues of law, which are reviewed de novo.

**111.** Ex. 4 (First Modified Fifth Amended Joint Chapter 11 Plan for Adelphia Communications Corporation and Certain of its Affiliated Debtors ("Plan")) § 2.1.

**112.** *Id.* § 2.3.

**113.** *See id.* § 5.1.

**114.** Ex. 167 (12/7/06 Transcript of Confirmation Hearing, vol. 2 ("Vol. 2 Hr'g")), at 19. *See also id.* at 20 ("I am not sure that it would

be possible to back into the individual answers [as to how each issue is resolved] from the components of the settlement.").

**115.** Bench Dec. at 85. *See also id.* at 87.

**116.** *Consolidated Rock Prods. Co. v. du Bois*, 312 U.S. 510, 520, 61 S.Ct. 675, 85 L.Ed. 982 (1941). Thus, Appellees' argument that Appellants are relying on an assumption that the Intercompany Claims are valid is somewhat disingenuous. It was the duty of the Bankruptcy Court to make a determination on that very point one way or the other. *See id.*

**117.** *See Kuehner*, 299 U.S. at 451, 57 S.Ct. 298.

stantive consolidation (which, by definition, results in the dissolution of intercompany claims), is a mischaracterization because when the creditors voted on the Plan, the Settlement had not yet taken effect.[118] Thus, a reviewing court may find that the Plan improperly eliminated the right of the class of Intercompany Claims to vote on that Plan and that class of claims "existed" prior to confirmation.

The consequences of the treatment of Intercompany Claims in the Plan could be grave. Appellants claim two points of error in this respect. *First,* Appellants assert that the Plan improperly classified Intercompany Claims because it lumped together prepetition and postpetition claims in violation of section 1122.[119] If these claims had not been improperly consolidated, Appellants argue that there is a reasonable possibility that the postpetition claims would have been entitled to administrative expense priority under section 1129(a)(9).[120] The record is devoid of any analysis as to the reason for and propriety of the lumping together of these claims in a single class. Thus, there is a substantial possibility that a reviewing court would find this classification to be clearly erroneous.

*Second,* Appellants claim that the Plan treats Intercompany Claims unfairly. The class of Intercompany Claims are clearly impaired under the definition of section 1124 because the Plan terminates those claims with prejudice.[121] However, any impaired class that does not receive a distribution is deemed to reject the Plan.[122] The Plan explicitly states that the class of Intercompany Claims receives no distribution under the Plan. Thus, there is a substantial possibility that a reviewing court would find that the Intercompany Claims are impaired, receive no distribution under the Plan, and thus are deemed to have rejected the Plan, thereby triggering the "cram-down" provision, which requires that the Plan not discriminate unfairly against the rejecting class.[123] The Bankruptcy Court, however, expressly found that the Plan did not trigger the cramdown provision and thus refused to analyze the Plan under section 1129(b).[124] This too may merit reversal.

In any event, Appellants claim—and Appellees do not seem to dispute—that if there were an express substantive consolidation, Appellants would be entitled to a 110% recovery as opposed to the 89% they receive under the current Plan. Thus, even if the reviewing court found that a *de facto*

---

118. Indeed, there is a strong possibility that a Settlement was never reached. *See supra* Part III.C.1.

119. *See* 11 U.S.C. § 1122(a) ("[A] plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.").

120. *See id.* § 1129(a)(9) (in order for a plan to be confirmed, the plan must provide for payment in full of administrative expenses as defined under section 507(a)(1)).

121. *See id.* § 1124 ("[A] class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan ... leaves unaltered the legal, equitable, and contractual rights to which such

claim or interest entitles the holder of such claim or interest.").

122. *See id.* § 1126(g).

123. *See id.* § 1129(b) (providing that a plan can be confirmed even if an impaired class does not vote to accept "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.").

124. *See* Bench Dec. at 148 (*"We do not have a cramdown situation here.* Thus the additional requirements of section 1129(b) are inapplicable.").

substantive consolidation is not procedurally improper, it could still find that Appellants are not receiving a fair distribution under the Plan because they are receiving less than they would receive in an express substantive consolidation.

### 3. Appellants Have Shown a Substantial Possibility of Success on Their Claim that the Plan Unfairly Discriminates in Violation of Section 1123(a)(4) of the Bankruptcy Code

Appellants argue that the solicitation process by which the Plan was established violates section 1123(a)(4) of the Bankruptcy Code, which provides that "[n]otwithstanding any otherwise applicable non-bankruptcy law, a plan shall ... provide the same treatment for *each claim or interest* of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." [125] Under the Plan, each member of the ACC Senior Noteholders class receives its pro rata share from the pool of available assets regardless of whether it voted to accept the Plan. However, those class members who voted to accept the Plan also receive broad releases and exculpations from the Debtors and other claimants who voted to accept the Plan, whereas those who rejected the Plan receive no such benefits.

According to the Bankruptcy Court, and the Appellees, the Plan satisfies the requirements of section 1123(a)(4) because each claimant receives its pro rata recovery from a single pool of funds in a like manner, distribution of which is "not conditioned on or in any way tied to the releases." [126] Thus, the treatment of each claim under the Plan "is the same whether the holder of such claim voted to accept or to reject the Plan." [127]

Appellants characterize the process rather differently, asserting that these releases and exculpations are, in essence, an "illegal payoff" of "extra consideration" to induce claimants to vote for the Plan. As a result, Appellants assert that the Plan violates the Bankruptcy Code by treating the claims of certain class members more favorably than others. [128]

◼ Neither the Bankruptcy Code nor applicable decisions from this Circuit establish parameters for analyzing whether a plan satisfies the requirement of "same treatment for each claim or interest." Therefore, it is an open question whether that requirement is violated when the receipt of releases and exculpations is conditioned upon a particular class member's vote to accept the Plan. [129]

Appellees place heavy reliance on the decision in *In re Heron, Burchette, Ruckert, & Rothwell*, [130] for the proposition that it is only the claimant's "claim or interest" that must be treated equally, rather than the claimant itself. [131] Appellees urge the Court to likewise distinguish between the Plan's similar treatment of claims, on the

---

125. 11 U.S.C. § 1123(a)(4) (emphasis added).

126. Bench. Dec. at 195. *See also* Appellees' Mem. at 30–31.

127. Bench Dec. at 196.

128. Appellants' Mem. at 11.

129. Because interpretation of the Bankruptcy Code is question of law, the Bankruptcy Court's ruling, on appeal, would be subject to de novo review.

130. 148 B.R. 660, 672 (Bankr.D.D.C.1992) ("The objectors fail to distinguish between a [claimant's] treatment under the plan on account of a claim or interest and treatment for other reasons. Only the former is governed by § 1123(a)(4).").

131. *See* Appellees' Mem. at 31.

one hand, and the dissimilar treatment of claimants for collateral reasons, on the other.[132]

Courts have not made a clear a distinction between treatment of "claimants" and treatment of "claims." For example, in *In re Joint Eastern and Southern District Asbestos Litigation*, the Second Circuit spoke in terms of equal treatment of "claimants" rather than "claims." [133] Likewise, in *In re AOV Industries, Inc.*, the D.C. Circuit focused on the treatment of claimants rather than claims, holding that "[i]t is disparate treatment when members of a common class are required to tender more valuable consideration—be it their claim against specific property of the debtor or some other cognizable chose in action—in exchange for the same percentage of recovery." [134]

Whether the Plan satisfies the requirements of equal treatment under section 1123(a)(4) of the Bankruptcy Code is a question that remains open for interpretation. There is no doubt here that in return for approving the Plan, some claimants will receive a more valuable settlement than others (*i.e.*, additional benefits on top of their pro rata distributions). While such an outcome may be permissible where the added benefit is given for truly collateral reasons (*i.e.*, independent from their status as claimants), here the benefit is given in exchange for the claimant's affirmative vote for the Plan—an added benefit that is tied directly to the Plan itself and given to some claimants in a class, but not all. Such an inducement may well have led some claimants to approve the Plan when they otherwise may have rejected it. As a result, creditors opposing the Plan may have been prejudiced by a quid pro quo exchange of Plan approval for valuable releases and exculpations.

Section 1123(a)(4) guarantees that each class member will be treated equally, regardless of how it votes on a proposed plan. Where the receipt of valuable benefits in a plan is conditioned on a vote to accept *that plan*, there is a very real possibility of dissuading or silencing opposition to the plan. In this context, the Bankruptcy Court's semantic distinction between the treatment of claims and claimants goes

---

**132.** It is not entirely clear, however, that *In re Heron* provides all the support that Appellees suggest. As the Appellants note, the decision may well be distinguishable because it only "permitted extra consideration to creditors who paid consideration for special treatment." Appellants' Mem. at 11. Here, the releases and exculpations are granted to some members of the ACC Noteholders class solely in return for their votes to accept the Plan, rather than for further "paid consideration."

**133.** 982 F.2d 721 (2d Cir.1992). Although the Second Circuit did not ultimately reach the question of whether the treatment at issue was permissible, the court's language is nonetheless instructive: "[W]e need not decide whether the Settlement also violates section 1123(a)(4) by failing to accord the 'same treatment' to health *claimant members* of [the class]." *Id.* at 749 (emphasis added).

**134.** 792 F.2d 1140, 1152 (D.C.Cir.1986) (concluding that an individual claimant was being subjected to unequal treatment). The import of other decisions is less clear. For example, in *In re Central Medical Center, Inc.*, the court held that a lottery system that subjected each claimant to the same process but that would result in different recovery amounts was permissible because "the Plan subjects all members of the same class to the same means of claim determination." 122 B.R. 568, 575 (Bankr.E.D.Mo.1990). In another case, *In re Union Meeting Partners*, the court was presented with a situation similar to the one here, in which creditors would receive additional consideration if they voted in favor of a proposed plan and released certain claims of liability. 165 B.R. 553, 566 (Bankr.E.D.Pa. 1994). However, the court did not comment on the propriety of that additional consideration, striking down the Plan on other grounds.

against the spirit of section 1123(a)(4) and what it seeks to protect. If an appeal of that issue is heard, there is a substantial possibility that Appellants will succeed in their argument that the distribution of certain benefits to some claimants but not others within a class violates section 1123(a)(4).

### 4. Appellants Have Made a Substantial Case on the Merits of Their Claim that the Bankruptcy Court Erroneously Found that the Plan Was in the Best Interests of the Objecting Creditors

The "best interest of creditors test" embodied in section 1129(a)(7) of the Bankruptcy Code [135] "involves a hypothetical application of chapter 7 to a chapter 11 plan." [136] The test requires that each holder of a claim or interest either (1) accept

the chapter 11 plan, or (2) receive or retain property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7. [137] The best interest of creditors test "applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan." [138] If even one dissenting member of an impaired class would get less under the Plan than in a hypothetical liquidation, the fact that the class as a whole approved the Plan is immaterial. [139] Consequently, section 1129(a)(7) is one of the strongest protections individual creditors have in chapter 11. [140]

 The proponent of the plan bears the burden of showing that the plan complies with section 1129(a)(7). [141] "That bur-

---

**135.** 11 U.S.C. § 1129(a)(7) provides, in pertinent part:

> With respect to each impaired class of claims or interests—
> (A) each holder of a claim or interest of such class—
> (i) has accepted the plan; or
> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

**136.** *In re Lisanti Foods, Inc.*, 329 B.R. 491, 500 (D.N.J.2005) ("A liquidation and distribution analysis is performed to see whether each holder of a claim or interest in each impaired class, as such classes are defined in the subject plan, receive not less than the holders would receive in a hypothetical [c]hapter 7 distribution to those classes.").

**137.** *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 761 (Bankr.S.D.N.Y.1992).

**138.** *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 North LaSalle St. P'ship*, 526 U.S. 434, 442 n. 13, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999). *Accord In re Am. Family Enters.*, 256 B.R. 377, 403 (D.N.J.2000) ("This subsection

focuses on individual creditors rather than on classes of claims or interests."). "As § 1129(a)(7) makes clear, the liquidation analysis applies only to non-accepting impaired claims or interests. If a class of claims or interests unanimously accepts the plan, then the best interests test is automatically satisfied for all members of that class. Moreover, under § 1126(f), a class that is not 'impaired' under the plan is deemed to have accepted the plan." *In re Drexel Burnham*, 138 B.R. at 761 (footnote omitted). "[A] class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan ... leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. § 1124(1).

**139.** *See* 7 Collier on Bankruptcy ¶ 1129.03[7][a] (Lawrence P. King ed., 15th ed.2000).

**140.** *See In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 297 (Bankr.S.D.N.Y.1990).

**141.** *See In re Lisanti Foods*, 329 B.R. at 500; *In re Am. Family Enter.*, 256 B.R. 377, 403 (D.N.J.2000); *Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship*, 248 B.R. 668, 690 (D.Mass.

den is met by showing that creditors will receive at least as much under the [p]lan as they would receive in a liquidation of the [d]ebtor's assets under chapter 7."[142] The bankruptcy court must find by a preponderance of the evidence that the plan is in the best interests of the creditors.[143] That determination "is a finding of fact, and it is reviewed under the clearly erroneous standard."[144]

Under chapter 7, a debtor's estate is liquidated by a trustee appointed by the Bankruptcy Court.[145] Whether a settlement that is included in a plan is in the best interests of the creditors requires an inquiry into whether a hypothetical chapter 7 trustee of the debtor's estate would have adopted the settlement as being in the best interests of the parties in interest.[146]

▆▆▆ In evaluating whether the Plan was in the best interests of the objecting creditors, the Bankruptcy Court analyzed each of the five factors it considered to be significant.[147] The court began its discussion by noting that it considered the first two factors alone to be dispositive, but would nonetheless discuss all five. In its analysis of the first two factors, however, the court did not assess the interests of the ACC debtor in particular, but rather assessed the aggregate costs to the entire combined estate of all of the Debtors in the absence of a Plan. *First*, it found that if the Plan were not confirmed and the IPO were required, the estates would spend approximately $715 million.[148] *Second*, the court found that if the estates were consolidated under a single trustee, the trustee's fee would exceed $70 million.[149] The problem with these estimates, of course, is that they lump all of the Debtors together.[150] It is only with respect to the final factor, the adoption of the Settlement, that the court focused on the particular interest of the objecting creditors, the ACC Bondholder Group. That approach places an unduly heavy burden on an objecting creditor by requiring it to prove that it would receive more under a chapter 7 liquidation than under the Plan despite the total financial burden on the combined estates resulting from the absence of a settlement.

---

2000); *In re Lason, Inc.,* 300 B.R. 227, 232 (Bankr.D.Del.2003).

142. *In re Lisanti Foods,* 329 B.R. at 500.

143. *See In re Dow Corning Corp.,* 255 B.R. 445, 499 (E.D.Mich.2000), *aff'd,* 280 F.3d 648 (6th Cir.2002); *Southern Pac. Transp. Co. v. Voluntary Purchasing Groups, Inc.,* 252 B.R. 373, 390 n. 79 (E.D.Tex.2000).

144. *Beal Bank,* 248 B.R. at 690. *Accord Kane v. Johns–Manville Corp.,* 843 F.2d 636, 649 (2d Cir.1988); *In re Dow Corning,* 255 B.R. at 523; *In re Travelstead,* 227 B.R. 638, 654 (D.Md.1998) (citing *Kane*). *Accord* Fed. R. Bankr.P. 8013.

145. *See generally* 11 U.S.C. § 704 (setting forth duties of a chapter 7 trustee).

146. *See id.* § 704(a) (providing that the chapter 7 trustee must "collect and reduce to money the property of the estate for which

such trustee serves, and close such estate as expeditiously *as is compatible with the best interests of the parties in interest"* (emphasis added)).

147. These factors included: "(i) the costs and discounts associated with an initial public offering of the TWC stock; (ii) the additional administrative expense costs of having one or more chapter 7 trustees appointed to liquidate the estates; (iii) the loss of value associated with losing the expertise of the Debtors' employees and professionals; (iv) increased claims against the Debtors and resulting delays in distribution; and (v) the Settlement embodied in the Plan." Bench Dec. at 198.

148. *See id.* at 199.

149. *See id.* at 202.

150. *See supra* Part III.C.2.

Further, Appellants argue that the Plan Proponents failed to satisfy their burden of proof under section 1129(a)(7) with regard to the proposed Settlement.[151] In its discussion of that factor, entitled "Adoption of Settlement," the Bankruptcy Court stated:

The Plan proposes distributions to creditors based on a settlement of disputed issues, including the MIA and a settlement with Bank Lenders. *The Plan Proponents believe it is reasonable to assume* that a chapter 7 trustee would adopt settlements similar to the Settlement and the settlement with the Bank Lenders embodied within the Plan in order to avoid the risks, length, costs and uncertainties of litigation. *I agree with the Plan Proponents.* I think that there's no realistic basis to conclude that a chapter 7 trustee for ACC would come to a different view as to the desirability of the Settlement than Tudor, Highfields, Oz, C.P., Satellite, and all of the accepting ACC classes of claims and interests did. Even if there were individual trustees for individual estates, and an ACC trustee took positions, as an advocate, allied with the interests of ACC creditors, there is no reasonable basis for a conclusion that he or she could argue anything other than the same merits that have been discussed at length above, or that the trustees for other estates would agree as to the merits of a chapter 7 trustee's positions. It is much more likely that taking into

account the complexity and expense of litigating the MIA and the risk of protracted litigation, the chapter 7 trustee for the ACC estate will adopt the Settlement, concluding, as I do, that it is in the best interests of the ACC estate and its creditors.[152]

According to Appellants, the court's assumption is contrary to the evidence of record. Appellants cite the testimony of Harrison J. Goldin, the only witness on the subject, who testified that if he were the chapter 7 trustee for ACC, he would definitely not enter into the Settlement.[153] In light of this testimony, the liquidation analysis prepared by Daniel Aronson, a Managing Director of Lazard, who testified as a fact witness, is flawed in that it *assumes* that the Settlement would exist in chapter 7 despite the fact that this is the very proposition to be evaluated.[154] Appellants argue that the "[p]roponents offered no alternative analysis as to what ACC creditors would receive in a chapter 7 case if there were no settlement and they had received instead what they were entitled to in a stand-alone liquidation." [155]

 "In order to show that a payment under a plan is equal to the value that the creditor would receive if the debtor were liquidated, there must be a liquidation analysis of some type that is based on evidence and not mere assumptions or assertions." [156] However, the valuation of a

---

**151.** *See* Appellants' Reply Mem. at 13.

**152.** Bench Dec. at 203–04 (emphasis added).

**153.** *See* Appellants' Mem. at 12 (citing Ex. 10 (Declaration of Harrison J. Goldin, dated December 4, 2006) ¶ 2).

**154.** *See id.* ("Mr. Aronson testified that he ran the liquidation analysis based on the assumption, given to him by the Debtors' attorneys, that chapter 7 trustees for all debtors would enter into the same settlement.") (citing Vol. 2 Hr'g at 92:15–25).

**155.** Appellants' Reply Mem. at 13.

**156.** *In re Smith,* 357 B.R. 60, 67–68 (Bankr. M.D.N.C.2006). *Accord Southern Pac. Transp. Co.,* 252 B.R. at 391 n. 79 ("A judgment about whether § 1129(a)(7) is met must be based on evidence, not assumptions."); *In re Hoosier Hi–Reach, Inc.,* 64 B.R. 34, 38 (Bankr.S.D.Ind.1986) ("The burden imposed by 1129(a)(7) must be met with evidence, not assumptions.").

hypothetical chapter 7 liquidation is, by nature, "inherently speculative"[157] and "is often replete with assumptions and judgments."[158] Appellants offered evidence (Goldin's testimony) that directly contradicts the assumption made by the Bankruptcy Court. The question, then, is whether it was clearly erroneous for the Bankruptcy Court to disregard Goldin's testimony and to rely on the assumption that a chapter 7 trustee for ACC would not have "come to a different view as to the desirability of the Settlement than Tudor, Highfields, Oz, C.P., Satellite [the five settling members of the ACC Noteholders Committee], and all of the accepting ACC classes of claims and interests did."[159]

The Bankruptcy Court cites no evidence other than the fact that many sophisticated creditors accepted the Settlement as part of an overall chapter 11 plan that incontestably contained many valuable benefits such as avoiding the IPO costs and vastly reducing administrative expenses. But this goes against the grain of the best interests test, which is designed to protect individual creditors even in the face of majority support for a plan.[160] The Bankruptcy Court also cited the complexity and expense of protracted litigation if the Settlement were not adopted. Appellants, on the other hand, relied on Goldin's testimony, which contains a host of reasons why a chapter 7 trustee would not adopt the Settlement. While Appellants may not have shown a substantial possibility of success on the merits with respect to this point of error, Appellants have raised a serious legal question and made a substantial case on the merits.[161]

### 5. Appellants Have Neither Shown a Substantial Possibility of Success Nor Raised a Serious Legal Question as to Their Remaining Claims

Appellants also allege that the Bankruptcy Court erred in the following ways: (1) by permitting the Plan to go forward even though six debtors did not have at least one impaired accepting class in violation of section 1129(a)(10); (2) by denying the ACC Noteholders the right to obtain increases in the value of the TWC stock through the "true-up" mechanism in the Plan; and (3) by permitting material and adverse modifications to the Plan without requiring resolicitation. As noted earlier, none of these points merit further discussion.

### D. Public Interest

There are public interest considerations on both sides of this dispute. On the one hand, there is a significant public interest in vindicating the rights of the minority and preventing the will of the majority to go unchecked by appellate review. "[A] plan of reorganization which is unfair to some persons may not be approved by the court even though the vast majority of creditors have approved it."[162] On the other hand, there is also a strong public

---

157. *In re Affiliated Foods, Inc.*, 249 B.R. 770, 788 (Bankr.W.D.Mo.2000).

158. *In re Crowthers*, 120 B.R. at 297–98.

159. Bench Dec. at 203.

160. *See* 7 Collier on Bankruptcy ¶ 1129.03[7][a].

161. *See Mohammed*, 309 F.3d at 101 (discussing the inverse relationship between irreparable harm and the level of success on merits

that must be shown, stating that "more of one excuses less of the other"); *LaRouche*, 20 F.3d at 72–73 (stating that where the balance of equities tips in favor of the movant, it need only present a "substantial case on the merits when a serious legal question is involved.").

162. *TMT*, 390 U.S. at 435, 88 S.Ct. 1157. *Accord In re Agent Orange*, 804 F.2d at 20.

interest in the swift and efficient resolution of bankruptcy proceedings.[163] Indeed, compromises are favored in bankruptcy precisely for the reason that they "minimize litigation and expedite the administration of a bankruptcy estate."[164] On balance, however, the public interest does not favor either side and thus, does not affect the Court's determination on the stay.

### E. Balancing of the Four Stay Factors

After evaluating and weighing the four stay factors described earlier, I conclude that a stay is warranted. Appellants have shown a substantial possibility of success on the merits of several claimed errors. In the absence of a stay, the merits of those claims will never be heard on appeal due to mootness—a quintessential form of prejudice—which will inevitably result from the substantial consummation of the Plan. Weighing against a stay is the potential for serious financial harm that all parties will suffer if a stay is ordered. But because a substantial bond would, in large part, ameliorate that harm, it does not outweigh the fact that Appellants have demonstrated both irreparable harm and a substantial possibility of success on the merits of their objections. The balancing

of equities tips in favor of granting a stay conditioned upon the posting of a substantial bond.

### F. Bond

▇ Even though Appellants have shown that they are entitled to a stay pending appeal of the Confirmation Order, and even though the risk of serious financial harm to the non-moving parties is outweighed by the remaining stay factors, that potential harm cannot be ignored. To the contrary, as outlined above, if a stay pending appeal is likely to cause harm by diminishing the value of an estate or "endanger [the non-moving parties'] interest in the ultimate recovery," and there is no good reason not to require the posting of a bond, then the court should set a bond at or near the full amount of the potential harm to the non-moving parties. As such, Appellants must post a substantial bond that is commensurate with the threatened loss to the non-moving parties.[165] Thus, Appellants are ordered to post a bond in the amount of $1.3 billion in cash or bond or a combination thereof.[166] Appellants shall post ten percent of that sum within twenty-four hours of the date of this Opinion, with the remainder to be posted within seventy-two hours of the date of this Opinion.[167]

---

**163.** *In re Savage*, 2005 WL 488643, at *2 ("[P]ublic interest favors the expedient administration of the bankruptcy proceedings.").

**164.** *In re Martin*, 91 F.3d at 393.

**165.** *See supra* Part III.B (outlining and estimating the harm to non-movants).

**166.** While bonds ranging from hundreds of millions of dollars to billions of dollars are uncommon, they have been required where the financial risks justified bonds of that size. *See, e.g., Burlington Indus., Inc. v. Edelman*, 666 F.Supp. 799 (M.D.N.C.1987) (half a billion dollar bond enjoining a tender offer); *Texaco, Inc. v. Pennzoil Co.*, 626 F.Supp. 250

(S.D.N.Y.1986) (one billion dollar appeal bond), *rev'd on other grounds*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987); *Price v. Philip Morris, Inc.*, No. 00–112, 2003 WL 22597608 (Ill.Cir.Ct. Mar. 21, 2003) (twelve billion dollar appeal bond), *rev'd on other grounds*, 219 Ill.2d 182, 302 Ill.Dec. 1, 848 N.E.2d 1 (2005).

**167.** It should be noted that Appellants will not necessarily lose the full value of the bond if they do not prevail on appeal. The purpose of the supersedeas bond here is not to act as liquidated damages to Appellees. Rather, if Appellants ultimately lose the appeal, in order for Appellees to recover any portion of the bond they will be required to prove up the

## IV. CONCLUSION

For the reasons discussed above, Appellants' motion for a stay pending appeal and for an expedited appeal is granted. Appellants are directed to post cash or a bond in the amount of $1.3 billion, with ten percent to be posted within twenty-four hours of the date of this Opinion and the remainder within seventy-two hours of the date of this Opinion. The briefing schedule on the expedited appeal is as follows: Appellants' brief is due fourteen days after the date of this Opinion. Appellees' brief is due fourteen days after service of Appellants' brief. Appellants' reply brief is due seven days after service of Appellees' brief. The Clerk of the Court is directed to close this motion.

SO ORDERED.

amount of damages that they actually suffered during and as a result of the stay. Once proven, that amount will be drawn from the bond fund, and the remainder will revert to Appellants. *See Matter of Theatre Holding Corp.*, 22 B.R. 884, 885–86 (Bankr.S.D.N.Y. 1982) ("The purpose of filing a supersedeas bond ... is to indemnify the party prevailing in the original action against loss caused by an unsuccessful attempt to reverse the holding of the bankruptcy court. However, the only compensable damages are those which are shown to be the 'natural and proximate' result of the stay.").